THE HEIRS OF DON CARLOS DE VILEMONT, APPELLANTS, v. THE UNITED STATES.

In 1795, Baron de Carondelet, the Governor-General of Louisiana, made a grant of land on the Mississippi River, upon condition that a road and clearing should be made within one year, and an establishment made upon the land within three years.

Neither of these conditions was complied with, nor was possession taken under the grant until after the cession of the country to the United States.

The excuses for these omissions, namely, that the grantee was commandant at the post of Arkansas, and that the Indians were hostile, are not satisfactory; because the grantee must have known these circumstances when he obtained the grant.

According to the principles established in the preceding case of Glenn and Thruston v. The United States, the Spanish authorities would not have confirmed this grant, neither can this court confirm it.

Moreover, in this case, the land claimed cannot be located by a survey.

THIS was an appeal from the District Court of the United States for the District of Arkansas.

It was a petition filed by the heirs of Don Carlos de Vile-
mont, under the act of 1824, as revived by the act of 1844,
praying the confirmation of a grant of land issued by the Baron
de Carondelet in 1795.

The circumstances attending the grant are set forth in the
opinion of the court.

The District Court decided against the claim and the peti-
tioners appealed to this court.

In the District Court, Horace F. Walworth, Mary B. Miles,
and James B. Miles, were made defendants with the United
States.

It was argued in this court by *Mr. Taylor*, for the appellants,
and *Mr. Lawrence* and *Mr. Crittenden*, (Attorney-General,) for
the appellees.  A brief was also filed by *Mr. Pike* for Mr. Wal-
worth

*Mr. Taylor*, for the appellants, thus noticed the omission of
Vilemont to comply with the conditions of the grant.  (It will
be seen, by referring to the opinion of the court, that this was
an important point in the case.)

The confirmation of the claim is resisted in the answer of
the District Attorney, on the ground that the conditions of the
grant were not complied with.  The conditions, as has already
been stated, were those almost invariably inserted in orders of
survey, that a road and a settlement should be made within a
given day.  The record contains the testimony of two aged
inhabitants of Louisiana, who, as officers in the same regiment
in which Vilemont served many years, were attached to the
person of the Governor, and one of whom was employed in the
Land-Office in New Orleans, showing that these conditions
were mere matters of form and mechanically inserted with the
orders of survey, without inquiring into the situation of the
land.  They add that they never were enforced, and that no
land was ever forfeited under the Spanish government on ac-
count of a non-compliance with these conditions.  This testi-
mony is emphatically confirmed by Judge Simon, for many
years a practising lawyer in Louisiana, and during six years
a judge of the Supreme Court of that State, before whose
eyes probably thousands of such claims have passed.

In this instance the land was asked for to establish a stock
farm.  What necessity was there to cultivate it, if such was
the purpose of the grant?  And how much of the two leagues
front and one in depth should have been cultivated and esta-
blished?  The land was twenty-five leagues below the mouth of
the Arkansas, and more than that distance from any white set-

tlement. What use would there have been for a road, and where would it have been?

But if these conditions, in such a case, were more than an idle formality, Vilemont would have been relieved from a compliance with them. In 1795, when the grant was made, and until 1802, Vilemont was the civil and military commandant of the post of Arkansas. During all this period he never left his post, not even to visit New Orleans. His presence there was constantly required by the threatening aspect of the Indian tribes by whom he was surrounded, while the garrison of the fort never exceeded forty men. Eight letters from Governor Carondelet to Vilemont, (which will be found on pp. 72 – 76 of the printed and Vilemont's official correspondence with the Governor of Louisiana, until his appointment to a higher office, in 1802,) furnish a striking proof of the arduous service in which he was engaged, and of ceaseless feuds among the Indians, and attacks upon the whites, and leave no doubt that even a temporary absence from the command would not have been tolerated by the Governor. Can it be pretended that, under these circumstances, the government seriously, and under pain of forfeiture, expected him to make a road within one year, and a settlement within three years, upon this rude and remote spot? The government kept him until 1802 at the post of Arkansas; the government then removed him to a new scene of service, and this, if any case, falls under the rule established in the United States v. Arredondo et al., 6 Pet. 745. "It is an acknowledged fact that if a grant is made on a condition subsequent, and its performance becomes impossible by the act of the grantor, the grant becomes single."

The other reason why a settlement could not be required of Vilemont is, that hostile Indians made it impossible. Vilemont was not bound, though he might have attempted, to form a settlement by agents. Indeed, already, in 1795 or 1796, he sent Bogy there with that object, but Bogy was driven off by the Indians. Nor did the danger from the Indians cease until a number of years after the change of government.

*Mr. Crittenden*, for the United States, made the following points:

I. That the appeal ought to be dismissed for want of being duly prosecuted.

II. That the appellants' ancestor was never put in possession of the lands, and the conditions on which the concession was made were not performed during the time therein limited, or during the sovereignty of Spain over the country, or subsequently.

There is no evidence whatever that the Surveyor-General, or a deputy approved by him, ever put Vilemont into possession of the lands as required by the terms of the concession. No survey was ever made, and no plat and certificate were ever reported to the governor, and no title in form could therefore have been issued to Vilemont at any time during the continuance of the Spanish power.

The petition of de Vilemont sets forth his desire to establish a plantation and stock farm, in order to supply the post, of which he was commandant, with cattle. This is the inducement he presents to de Carondelet to make the concession. It was accordingly made to him under the express condition that he shall make the regular road and clearing within the peremptory* term of one year, the concession to be null, if, at the precise expiration of three years, the land should not be established.

From the date of the grant, in 1795, until the delivery of Louisiana to the United States, in 1803, he had completely failed to comply with the conditions above mentioned, and thereby forfeited all right to require a title in form. He had done nothing whatever. This, therefore, is not such a concession as might have been perfected into a complete title had not the sovereignty of the country been transferred to the United States.

But to examine the evidence on the point of non-performance of the conditions presented in the record :

The appellants themselves state, in their petition, that De Vilemont " endeavored, soon after the date of said concession, to procure persons to make a settlement, but could not succeed " on account of the danger arising from hostile Indians. It further states, " that in the year 1803 he again attempted a settlement, but that, from the year 1807," he, or persons employed by him or his family, had been in actual possession of part of the land.

The above is the petitioners' own statement. In 1813, in De Vilemont's lifetime, when he presented his claim to the recorder of land titles, he did not submit a particle of proof to show that he had done any thing with respect to establishing the stock farm, making the road, or settling the land. Joseph Bogy, his father-in-law, then testified that he, De Vilemont, proposed to witness to settle on the tract, but that he declined on account of the supposed danger from the Indians, which continued until 1803. Francis de Vaugene also then testified that the Indians continued so hostile as to make it unsafe to settle at Isle Chicot till the year 1803.

---

* The Spanish word is printed *percutorio;* it should have been *peremptorio.* All the translators agree in translating peremptorio.

It will thus be seen that De Vilemont made no pretence then, or offered no proof to show, that he had fulfilled any of the conditions, but he sets up an excuse merely for not having done so. The recorder, under the column titled "possession, inhabitation, or cultivation," states, "danger from the Indians prevented settlement," and gives his opinion that the claim ought not to be confirmed, the conditions not having been complied with.

Mr. Crittenden then examined the evidence.

But it is said that De Vilemont could not leave his post to attend to the performance of the conditions, that he was prevented from performance by danger from the Indians, and that the conditions were merely formal.

The answers to the first of these excuses are obvious. De Vilemont styles himself, in the petition to Baron de Carondelet, the commandant of the post of Arkansas, and asks for the land at the place it is given, the inducement being, that he might furnish cattle to the post. It would be strange if, under these circumstances, his not being allowed to leave the post should excuse the performance of the conditions. As to being prevented from establishing the stock farm, and performing the other conditions, by danger from the Indians, he knew that the Indians were in the country at the time he made the application; and if he sought for a concession, the conditions of which he could not comply with, it can afford no exemption from their performance. As to the allegation that the conditions were merely formal, it is negatived by the third article of O'Reilly's regulation, where the non-performance of the conditions as to roads, settlements, &c., is thus spoken of: "And in default of fulfilling these conditions, their land shall revert to the king's domain, and be granted anew." 2 White's Recop. 228. These regulations were approved by the king. See letter of Marquis de Grimaldi to Unzaga, 24th August, 1770, Id. 460. See also the third, fourth, fifth, and sixth articles of regulations of Morales, Id. 235.

III. That the evidence in the case shows that De Vilemont had abandoned his claim to the land.

IV. That the concession is void, because no land was severed from the public domain by survey giving it a certain location, previous to the treaty of cession, and the description is so vague, indefinite, and uncertain, that no location can be given to the lands. United States v. Miranda, 16 Pet. 156; United States v. Boisdoré, 11 How. 63.

V. That the decree as to floats is void, the individuals holding the lands in respect of which floats are decreed, not having been made parties in the case.

Mr. Justice CATRON delivered the opinion of the court.

The heirs of Don Carlos de Vilemont filed their petition in the District Court of Arkansas, to have a confirmation of a grant for two leagues of land front, by one league in depth, lying on the right descending bank of the Mississippi, at a place called the Island del Chicot, distant twenty-five leagues below the mouth of the Arkansas River; the cypress swamp of the island being called for as the upper boundary of said tract.

The Governor-General granted the land on the express conditions, "that a road and regular clearing be made in the peremptory space of one year; and this concession to be null, if, at the expiration of three years' time, the said land shall not be established; and, during which time it cannot be alienated; under which conditions the plat and certificate of survey shall be made out and remitted to me in order to provide the interested with the corresponding title in form." The concession was made June 17, 1795. No possession was taken of the land by De Vilemont, nor any survey made or demanded, during the existence of the Spanish government. The petition alleges that possession was first taken in 1807; and as an excuse for the delay, it is stated, that the grantee was commandant at the post of Arkansas up to the end of the year 1802, and confined to his official duties there; and, 2dly, that so hostile were the Indians in the neighborhood of the land, that no settlement could be made on it. The proof shows that De Vilemont first took possession in 1822 or 1823. The 2d regulation of O'Reilly of 1770, required that roads should be made and kept in repair, in case of grants fronting on the Mississippi River; and that grantees should be bound within the term of three years to clear the whole front of their lands to the depth of two arpens; and, in default of fulfilling these conditions, the land claimed should revert to the king's domain; nor should proprietors alienate until after three years' possession was held, and until the conditions were entirely fulfilled. In this instance the time was restricted to one year, for making the improvements required by the regulations, and three years were allowed for making an establishment on the premises. In this case where a front of six miles was granted, a clearing to the whole extent was of course not contemplated; yet to a reasonable extent it certainly was; but it was undoubtedly necessary, that an establishment should be made within three years — such being the requirement of the concession, in concurrence with the regulations.

The act of March 26, 1804, prohibited any subsequent entry on the land; and declared void all future acts done to the end of obtaining a perfect title even by an actual settler, if the settlement was not made before the 20th of December, 1803;

De Vilemont's title must therefore abide by its condition when the act of 1804 was passed.   For further views on this subject we refer to our opinion expressed on Clamorgan's title, at the present term, in the case of Glenn and Thruston *v.* The United States.

We are asked to decree a title, and to award a patent, on the same grounds that the Governor-General of Louisiana, or the Intendant, would have been bound to do, had application for a perfect title been made during the existence of the Spanish colonial government.   The only consideration on which such title could have been founded, was inhabitation and cultivation, either by De Vilemont himself, or his tenants; and having done nothing of the kind, he had no right to a title; nor can an excuse be heard that hostility from Indians prevented a compliance with the conditions imposed, as Vilemont took his concession subject to this risk; and the alleged excuse that he was commandant of the post of Arkansas, and bound to be constantly there in the performance of his official duties, is still more idle, as he held this office when the concession was made, and knew what his duties were.

The petition was dismissed by the District Court, because the land claimed could not be located by survey.   The concession is for two leagues front, by one in depth, with parallel boundaries, situate at Chicot Island; the cypress swamp on the island being the upper boundary.   Chicot Island is represented in the concession as being twenty-five leagues below the mouth of the Arkansas River.   The land now claimed by the petition is represented to lie five leagues below the mouth of that river, at a place known as Chicot Point; being a peninsula included in a sudden bend, and surrounded on three sides by the Mississippi River.

It is difficult to conceive that Chicot Point, lying in fact nearly twenty-five leagues below the mouth of the Arkansas, is the Chicot Island to which the concession refers; but admitting that the Point was meant, (which we believe to be the fact,) still, no cypress swamp is found there to locate the upper boundary; nor is it possible to make a decree fixing any one side line, or any one place of beginning, for a specific tract of land.

Our opinion is, that, on either of the grounds stated, the petition should be dismissed, and the decree below affirmed.

### Order.

This cause came on to be heard on the transcript of the record from the District Court of the United States, for the Dis-

trict of Arkansas, and was argued by counsel. On considera-
tion whereof, it is now here ordered, adjudged, and decreed by
this court, that the decree of the said District Court in this cause
be, and the same is hereby, affirmed.