JOHN CHARLES FREMONT, APPELLANT, v. THE UNITED STATES.

By the act of congress passed on the 3d March, 1851, (9 Stats. at Large, 631,) to ascertain and settle the private land claims in the State of California, it is made the duty of every person claiming lands in California, by virtue of any right or title derived from the Spanish or Mexican government, to present the same to the commissioners (to be appointed under that act) who were to examine and decide upon the validity of the claim.

The commissioners, the district, and the supreme court, in deciding on any claim brought before them, were directed to be governed by the treaty of Guadaloupe Hidalgo, the law of nations, the laws, usages, and customs of the government from which the claim is derived, the principles of equity, and the decisions of the supreme court of the United States, as far as they are applicable.

Under this act, not only inchoate or equitable titles, but legal titles, also, were required to be passed upon the court. This was an essential difference from the act of 1824, under which claims to land in Louisiana and Florida were decided, and which related to inchoate equitable titles.

Grants of land in Louisiana and Florida were usually preceded by a concession and survey; and until a survey took place, no title accrued to the grantee. Hence, this court has always decided that where the grantee took no further steps in the matter, he had acquired no right, legal or equitable, to the lands under the Spanish government.

The laws of these territories, under which titles were claimed, were never treated by this court as foreign laws, to be decided as a question of fact; but the court held itself bound to notice them judicially, as much so as the laws of a State of the Union.

On the 29th of February, 1844, Micheltorrena, the governor of California, granted to Juan B. Alvarado, the tract of land known by the name of Mariposas, to the extent of ten square leagues within the limits of the Snow Mountain, (Sierra Nevada,) and the rivers known by the names of the Chauchilles, of the Merced and San Joaquin, as his property, subject to the approbation of the most excellent departmental assembly, and to certain conditions.

This grant conveyed to him a present and immediate interest. If any subsequent grantee of the government had made a survey within the described limits, his title would have been paramount to that of Alvarado. But no such grant and survey were made.

The case of Rutherford v. Greene's Heirs, 2 Wheat. 196, examined.

No further and definite grant, stating that the conditions had been complied with, was necessary.

The conditions were conditions subsequent, but a non-compliance with them did not amount to a forfeiture of the grant.

There was no unreasonable delay or want of effort, on the part of Alvarado, to fulfil the conditions, so that there is no room for the presumption that he intended to abandon the property.

The reasons explained why Alvarado did not make a survey or a settlement, and why Fremont, his vendee, did not.

One of the conditions was that Alvarado should not sell, alienate, or mortgage the property. But this restriction was void, as being against the laws of Mexico, and, moreover, at the time of the sale to Fremont, California was held by the United States as a conquered country, and an American citizen had a right to purchase property. Although Mexico might have avoided the sale, there is no public law which could require the United States to do so; and any law which subjected an American citizen to disabilities was necessarily abrogated without a formal repeal.

The question about the right to mines does not arise in the present case.

The United States have to direct, by law, how the survey is to be made, in the form and divisions prescribed for surveys in California, embracing the entire grant in one tract.

Mr. Justice DANIEL did not sit in this cause.

This was an appeal from the district court of the United States for the northern district of California.

Fremont, the appellant, claimed title to a large tract of land, and prosecuted his claim before the board of commissioners, who decided in his favor. That decision having been reversed by the district court, the case was now brought here by appeal.

The title of Fremont was derived from Juan Alvarado, to whom a grant was issued, in 1844, by Manuel Micheltorrena, then governor and commandant-general of the department of the Californias, purporting to be founded upon the patriotic services of Alvarado. It appears that, as early as 1836, Alvarado was conspicuous in the commotions which took place in California, resulting from the same proceedings of the government of Mexico which occasioned the revolution in Texas. California declared itself opposed to the centralization of power in Mexico, and Alvarado was proclaimed governor by the provincial deputation. In 1837, he repelled the effort of Cavvillo to take possession of the government, who had been appointed governor by Mexico; and Alvarado was afterwards confirmed as constitutional governor by the authorities of Mexico. He continued in authority until 1842, when Micheltorrena was appointed to succeed him, under whom Alvarado was employed as first counsellor of the departmental junta, with a salary of $1,500.

On the 23d of February, 1844, Alvarado petitioned Micheltorrena to grant him the land in question. And as this is one of the first cases in this court of this description, it is deemed proper to insert in full the title under which the appellant claimed. The documents are as follows :—

" Record of proceedings instituted by citizen Juan Bautista Alvarado, colonel of the auxiliary militia, soliciting the tract of land called ' Las Mariposas.'

" Anno 1844. (Number 352.)

" To his Excellency the Governor :—

" I, Juan B. Alvarado, colonel of the auxiliary militia of this department, to your Excellency, with due respect, do represent, that being actually the owner (by purchase which I made) of a very small tract of land, which is not sufficient to support the cattle with which it is stocked, without injury to the estates likewise there established, and being desirous of increasing it, at the same time to contribute to the spreading of the agriculture and industry of the country, I solicit your Excellency, according to the colonization laws, to be pleased to grant me ten sitios de ganado mayor (ten square leagues) of land, north of the River San Joaquin, within the limits of the Snow Mountain, (Sierra

Nevada,) in the same direction the River Chanchilles, in the east part of the Merced, on the west, and the before-mentioned San Joaquin, with the name of the Mariposas, offering to present to Y. E. the proper plan and draft thereof so soon as the same shall be made with exactness, not doing it at this time for the difficulty of being a wilderness country on the confines of the wild Indians, and because I desire that my claim for this cause may not be delayed.

"Therefore, I hope from the good intentions of Y. E., in favor of the improvements of the country, the most favorable result, if it be in justice, by which I will receive favor.

"(Signed)        JUAN B. ALVARADO.
"*Rancho del Alizal, 23d of February,* 1844."

"*Monterey, 27th of February,* 1844.
"Let the secretary of state report, and he may require such other reports as he may deem expedient, should he need them.
"(Signed)        MICHELTORRENA."

"As directed by his Excellency, the governor, let the preceding petitioner be referred to the first alcalde of San José, that he may be pleased to report thereon.
"(Signed)        MANUEL JIMENO.
"*Monterey, 26th\* of February,* 1844."

"To the Secretary of State:—
"The land solicited in this petition by Don Juan B. Alvarado is entirely vacant; it does not belong to any individual, town, or corporation, and I believe that for these reasons, as well as that of the petitioner being meritorious for his patriotic services and commendable circumstances, there is no impediment for granting him the said land in fee.   This is all I have to report to your Honor in answer to your preceding superior order, which opinion I submit to the decision of your Honor, which will be the most proper one.        (Signed)        ANTONIO M'A PICO.
"*Town of San José, Gaudaloupe, February* 29, 1844."

"To his Excellency the Governor:—
"According to the report of the magistrate of San José, and the information I have acquired from persons who know the land, it is ascertained the same may be granted to the petitioner, who may be favorably considered for the services which he has rendered to the department.   The superior judgment of Y. E. will decide the expediency.        (Signed)        MANUEL JIMENO.
"*Monterey, 29th of February,* 1844."

---

\* NOTE BY THE REPORTER.  The dates of these muniments of title are as above, in the printed record.  If there be an error, the reporter has no means of knowing where it is.

"*Monterey*, 22*d of February*, 1844.

" Let the title be issued, expressing that he (the petitioner) is meritorious for his patriotic services, and consequently worthy of preference.          (Signed)          MICHELTORRENA."

"*Monterey*, 29*th of February*, 1844.

" Having considered the petition which is at the beginning of this record of proceedings, (*espediente*,) the preceding report, and the patriotic services of the petitioner, with every thing worthy of consideration in the premises, in conformity with the laws and regulations upon the subject, I declare Don Juan Bautista Alvarado owner in fee of the tract of land known by the name of "Las Mariposas," within the boundaries of the Snow Mountains, (Sierra Nevada,) and the rivers called the Chanchilles, the Merced, and San Joaquin.

" Let the proper patent be issued, let it be registered in the respective book, and let this record of proceedings be transmitted to the most excellent departmental assembly, for its approval.                    MANUEL MICHELTORRENA,

" *Brigadier-General of the Mexican Army, Adjutant-General of the Staff of the same, Governor and Commandant-General of the Department of the Californias.*"

" Whereas, Don Juan B. Alvarado, colonel of the auxiliary militia of this department, is worthy, for his patriotic services, to be preferred in his pretension for his personal benefit and that of his family, for the tract of land known by the name of the Mariposas, to the extent of ten square leagues (sitios de ganado mayor) within the limits of the Snow Mountain, (Sierra Nevada,) and the rivers known by the names of the Chanchilles, of the Merced, and the San Joaquin, the necessary requirements, according to the provisions of the laws and regulations, having been previously complied with, by virtue of the authority in me vested, in the name of the Mexican nation, I have granted to him the aforesaid tract, declaring the same by these presents his property in fee, subject to the approbation of the most excellent the departmental assembly, and to the following conditions: —

" 1. He shall not sell, alienate, or mortgage the same, nor subject it to taxes, entail, or any other incumbrance.

" 2. He may inclose it without obstructing the crossings, the roads, or the right of way; he shall enjoy the same freely and without hindrance, destining it to such use or cultivation as may most suit him; but he shall build a house within a year, and it shall be inhabited.

" 3. He shall solicit, from the proper magistrate, the judicial possession of the same, by virtue of this patent, by whom the boundaries shall be marked out, on the limits of which he (the grantee) shall place the proper landmarks.

46*

" 4. The tract of land granted is ten sitios de ganado mayor, (ten square leagues,) as before mentioned. The magistrate who may give the possession shall cause the same to be surveyed according to the ordinance, the surplus remaining to the nation for the proper uses.

" 5. Should he violate these conditions, he will lose his right to the land, and it will be subject to being denounced by another.

" Therefore, I command that these presents being held firm and binding, that the same be registered in the proper book, and delivered to the party interested, for his security and other purposes.

" Given in Monterey, this 29th day of the month of February, in the year of 1844.                     MANL. MICHELTORRENA.

" MANUEL JIMENO, Secretary."

" This patent is registered in the proper book on the reverse of folio ' 6.'                                        JIMENO."

The evidence showed that the land continued to be disturbed by hostile Indians, until after the occupation of California by the Americans, and until 1849.

On February 10, 1847, Alvarado executed a deed of the above-described property to Fremont, with a general warranty of title. The consideration stated was three thousand dollars.

In 1849, Fremont caused a map of the grant to be made, and used efforts to have it settled.

On the 21st of January, 1852, Fremont filed his claim before the commissioners to ascertain and settle the private land claims in the State of California, sitting as a board, in the city of San Francisco.

On December 27, 1852, the board decreed that the claim be confirmed, to the extent of ten square leagues, being the same land described in the grant and map filed in the office of the United States surveyor-general for California, November 21, 1851.

On the 20th of September, 1853, there was filed in the office of the commissioners a notice from the attorney-general of the United States, that an appeal from the decision of the commissioners to the district court of the United States for the northern district of California, would be prosecuted; and in consequence of that appeal, the decision of the commissioners was reversed on the 7th of January, 1854. It was now brought before this court by an appeal from the district court.

It was argued by *Mr. William Carey Jones, Mr. Bibb,* and *Mr. Crittenden,* for the appellant, and by *Mr. Cushing,* attorney-general, for the United States.

The briefs filed in this case were, as in the preceding case of

United States *v.* Ritchie, very elaborate; and the reporter can only notice the points made, without attempting to state either the arguments or authorities by which they were sustained.

The following notice of the points made for the appellant, is taken from the brief of *Mr. Jones.*

1. The acts and deeds above recited, of the Mexican authorities, vested a legal, valid title, independent of the approbation of the departmental assembly; that being a means not of legalizing the title, but only of placing it beyond any power of defeasance. Consequently, if the necessity of fulfilling the condition arose from the incompleteness of the title, the objection falls to the ground. But—

2. The condition is not warranted by the law, and hence was not obligatory. The provision contained in § 11 of the regulations of 1828 refers only to grants to empresarios, for colonization.

3. Non-performance of the condition did not make the grant void, but only opened the land to denouncement; that is, to an information by a third person, who, finding the land vacant, might wish to possess it, and on which a judicial inquiry would be had; until which time (and a judicial forfeiture ascertained) the grant remained good, and the land open to the occupation of the grantee, and after his occupation the process of denouncement would not lie. The government did not reserve any right of forfeiture to itself, and consequently could not convey any to the United States.

4. Due diligence was used, both by Alvarado and Fremont, to fulfil the condition, and they did fulfil the requirements of the law.

5. That if the grant had been defeasable under the former government, through the dissent to it of the assembly and of the supreme government, that mode of defeasance is now cut off and made impossible by the non-existence of the assembly, to which only belonged the initiative to that end; and if formerly defeasible by denouncement for non-performance of the condition, that also is cut off by the terms of the treaty of purchase, and because there was no denouncement prior to the occupation, when the right lapsed. Moreover, the commission and courts herein are not holding an inquest to enforce forfeitures, but are sitting in equity to confirm rights—to carry out and enforce a trust.

6. The cases from this court cited by the judge below have not the effect he imagines, but the contrary.

7. The governor was the officer who, at the time of this grant, was authorized to concede lands in California; and there was no law or regulation in force that required the concession to be

approved by the departmental assembly, nor was there any such body in existence.

8. This grant was in consideration of public services, and not subject to any condition. Aredondo's Ca. 6 Pet. 716, and authorities cited; Menard v. Massey, 8 How. 293; Jones's Rep. Sen. Doc. 18, 2d ses. 31st cong. 4 & 26; 2 Febrero Mexicano, 190, 191, §§ 19–21; Gamboa's Mining Ordinances of New Spain, index sube voc. and vol. i. 29; vol. ii. 76; Ib. 103, et seq.; opinion of the commission in case of Cervantes, Rec. of that case, 33, 39, and authorities cited; case of Garcia v. Bon, cited in opinion of Com. Hall, Rec. 28, 29; 1 Conejo, Diccionario Derecho Real; Glen v. United States, 13 How. 250; De Villemonte's Ca. 13 Ib. 266; Boisdoré's Ca. 11 Ib. 115; Sibbald's Ca. 13 Pet. 313; Bases of Tacubaya, 1 Observador Judicial, 7: Instructions to Micheltorrena, printed in supplemental brief.

A second objection to the title was raised in the court below, namely: That the tract had not been surveyed under the former government, and its description and calls are insufficient to locate it. But—

1. This question is not before the court, because the act of congress does not impose the question of location and boundaries on either the commission or the courts; thus differing (and for sound reasons of policy and right) from the acts which opened the federal courts to the adjudication of claims in Florida, Missouri, and Louisiana. 1 Curtis's Com. 448, 449; 10 Pet. 334, 335; 13 Ib. 133; 15 Ib. 182; 16 Ib. 162, 166; Cong. Globe, 2d ses. 31st Cong. 375, Gwin's Rem.; Appendix to Ib. 56, 58; Ib. 134; Capt. Halleck's Rep. Sen. Doc. 1st ses. 31st Cong. No. 18; Jones's Rep. before cited; Instructions to the commission by Secretary of Interior, before cited authorities in Mr. Lockwood's brief.

2. The description and calls are sufficiently definite; there has been no difficulty in finding the particular place granted; it is well known; the quantity, and the place where it is to be surveyed, are both definite; the surveyor-general has ascertained them by actual survey.

3. The claimant had a right of selection, under the law and customs of California, of the quantity granted to him, within the boundaries, and at the place designated, leaving the overplus to the nation; and it is this overplus that is to be ascertained by survey; until which, if the rights of either party be indefinite within the given boundaries, they are those of the nation and not those of the grantee.

4. The laws under which this grant was made did not contemplate surveys or exactness in the definition of the tracts

solicited or granted, but only a delineation — necessarily rude, since there was no scientific person in the whole country to make it — of the locality where the quantity was to be granted, and the overplus, if any, afterwards to be ascertained and resumed; and in this case, the designation and description supply the place of, and are as certain as, any such rude sketch could have been.

5. The whole matter of location and segregation, under and according to the grant, is referred to the surveyor-general, and he has already exercised that function, so as to show that there is no difficulty attending it.

*Mr. Cushing* divided his argument into two branches; the first, considering the grant as a concession of agricultural lands, under the colonization laws of the Mexican Republic, and the second, considering the land as mining land. The latter branch is omitted from this case, as are the remarks of the opposite counsel upon the same subject, as a grant of agricultural lands.

Sect. 1. Fremont's claim is on a gratuitous colonization grant, by the Mexican governor of California, to one Alvarado, of which there had been no survey; no plan; no occupation; no site even; no confirmation by the proper public authority; no performance of any of the conditions precedent or subsequent annexed to the grant, violation of prohibiting conditions; a mere naked initiatory concession, upon paper, at the date of the treaty of Guadaloupe Hidalgo.

Such is the extraordinary pretension of paper title.

The pretension of location is yet more extraordinary. It is of a right to locate a tract of land, ten square leagues in dimension, anywhere at the discretion of the grantee, and in any form of combination of the subdivided sectional parts, so that they touch one another, within a region of upwards of one hundred square leagues.

The Mexican system of colonization included the following principles : —

The grants were made on conditions equitably combining private and public utility.

The system was modified according to circumstances, but always preserved the principle of grants on condition, the consideration of the grant being the performance of the conditions.

The system of settling polladores was applied to California.

Sect. 2. The concession to Alvarado was null for uncertainty of description and incapability of definite location.

Alvarado petitioned for lands which he had never seen and of which he had no description. He asked for lands "north" of the San Joaquin, supposing that river to run to the west, and west of the Snow Mountains, and between the Chanchilas and

Merced Rivers, apparently supposing that they run south and enter into the first-named river, and that the tract contains ten square leagues, when it includes over a hundred. The grant is equally indefinite.

The land claimed in Fremont's petition is for the like quantity lying on the "east" side of the San Joaquin, and claimed as the "Las Mariposas" grant, without specific boundaries or locality, other than being between the Snow Mountains and the San Joaquin. There is no proof that the "Las Mariposas" had been surveyed or had any specific boundaries. Not one witness could give its boundary, size, or contents. The Chanchilas does not empty into the San Joaquin, but runs westerly of the Snow Mountains, and without an outlet spreads itself over the Tulare Valley and is lost in it. 2 How. 63; 3 Ib. 773; 13 Ib. 251.

Sect. 3. The concession was not confirmed by the departmental assembly, and is not now entitled to confirmation.

By the terms of this grant, it was subject to the approval of the departmental assembly. Unless that was obtained, it was not valid. Obtaining this was a condition precedent to the perfection of the title. The governor had no power to excuse this preliminary and essential condition. A failure to perform a condition precedent, renders the grant null and void. There is no pretence that this condition has been performed. Nor was it repealed by the grantor or the act of God. No effort was made to perform it, as shown by testimony, while by the terms of the grant the whole would be void if not complied with.

Sect. 4. This grant is void, because the conditions annexed to and forming a part of it have never been performed.

The grant was under the colonization laws, for agricultural purposes. The settlement and cultivation of a new country were the leading motives to the grant. The government could derive no advantage from granting lands, which were to remain wild and unoccupied.

Hence the condition imposed in this grant, that, within the first year, Alvarado should build a house, and that it should be inhabited. No such house was built, and, of course, none was inhabited. There was no attempt to perform this condition.

He was required to solicit judicial possession of the land from a magistrate, by whom the boundaries should be marked out, on the limits of which the grantee was to place the proper landmarks. No such possession was ever solicited or given, nor limits fixed, or landmarks placed. The terms of this condition have been wholly uncomplied with.

No magistrate ever caused these ten square leagues to be surveyed, so as to separate the granted from the ungranted lands.

This. condition was important, with reference to further grants and settlements. Without its performance, it could not be known what remained open for grants and settlement. So far from this condition being complied with, it is not even now known where this grant is to be found.

Sect. 5. Until the governor-general confirmed the concession. the title remained in the crown.

The court may refuse to confirm where he would. Under the act of 1824, applications to confirm imperfect titles have been resisted, because conditions subsequent have not been complied with.

Sect. 6. None of the excuses for non-performance, alleged in Alvarado's behalf, possess legal force.

Sect. 7. Alvarado could not lawfully convey to Fremont a title, on which to call for a patent from the United States.

It is an elementary proposition in law, that a grantor can confer no greater title than he held, and was authorized by law to convey.

By the terms of this grant, if held valid, Alvarado had no transferable interest. The object of the government was to insure settlement and cultivation, and not to make grants that might be transferred to speculators, or incumbered in the behalf of creditors. Hence, the first condition was that he should not sell ; and, by the last, if he did, he was to lose his right, and then it would be subject to be granted to another.

If the departmental assembly had approved, and all the other conditions had been fulfilled or excused, Alvarado could not have been excused from this one, without the performing an express act by one authorized by law for that purpose. Under the colonization laws, under which this grant was made, this essential condition could not have been waived. It was deemed so essential, that no one was clothed with power to release the grantor from it. No excuse is offered for violating this condition. It was voluntary, and without the apology of impossibility or release.

Sect. 8. The decision of the commissioners is itself null and void, for uncertainty and vagueness ; and, if it should be confirmed, the land granted could not be located so as to be patented.

Sect. 9. The grant to Alvarado was a gratuitous one, except in so far as the performance of the conditions would relate back to constitute a consideration.

Sect. 10. The original petition, the provisional grant, and tne decree of the commissioners, each assumes a floating claim, not as a grant of an identical tract of land, by metes and bounds, all of which is without warranty of law.

Sect. 11. Under the foregoing authorities, it is maintained, in opposition to the claim of Fremont, the petitioner: —

1. The land in California passed, by conquest, to the crown of Spain, subject to the occupancy of the Indians; so much of it as remained ungranted, and not severed from the royal domain, passed to the Mexican Republic, by the fact of its independence of Spain, as national domain; and so much of it as had not been severed from the national domain of Mexico, by lawful grant or other sufficient title, passed to the United States by the treaty of Guadaloupe Hidalgo, and became public lands of the United States.

2. Hence, according to the whole series of decisions under the Louisiana and Florida treaties, and, by parity of reasoning, under that of Guadaloupe Hidalgo, as all the land was, and is, in the first instance, that of the prince or government standing for the aggregate political society, whoever claims as against the State, that is, against the people of the United States, to own any part of such land in severalty, and segregated from the public domain, is held to show a "right or title," either at law or in equity.

3. The grant to Alvarado was a donation, or gratuitous grant, under the decree of 1824 and the regulations of 1828, concerning colonization, and subject to all the limitations of those acts, from which the departmental authorities could not derogate, except in the particulars expressly authorized by the same.

4. The petitioner, Fremont, has no claim on the equities of the United States, in regard to the land donated to Alvarado, unless the latter complied with the conditions of the Mexican law, which constituted the inducement of the grant. This, in point of fact, he did not do; and so the lands fall back into the public domain of the United States.

Mr. Chief Justice TANEY delivered the opinion of the court.

The court have considered this case with much attention. It is not only important to the claimant and the public, but it is understood that many claims to land in California depend upon the same principles, and will, in effect, be decided by the judgment of the court in this case.

A preliminary question has been raised, as to the jurisdiction of the district court from which the appeal has been taken; but the same question has been already examined and decided in the case of the United States v. Ritchie, and it is unnecessary to discuss it further. We think it very clear that the district court had jurisdiction, and proceed to examine the validity of the claim upon this appeal.

The 8th section of the act of March 3, 1851, "to ascertain

and settle the private land claims in the State of California," directs: "That each and every person claiming lands in California, by virtue of any right or title derived from the Spanish or Mexican government, shall present the same to the commissioners, (to be appointed under that act,) when sitting as a board, together with such documentary evidence and testimony of witnesses as the said claimant relies upon in support of such claims; and it shall be the duty of the commissioners, when the case is ready for hearing, to proceed promptly to examine the same upon such evidence, and upon the evidence produced in behalf of the United States, and to decide upon the validity of the said claim, and, within thirty days after such decision is rendered, to certify the same, with the reasons on which it is founded, to the district attorney of the United States in and for the district in which such decision shall be rendered."

And the 11th section provides, that the commissioners therein provided for, and the district and supreme court, in deciding on any claim brought before them under the provisions of that act, shall be governed by the treaty of Guadaloupe Hidalgo, the law of nations, the laws, usages, and customs of the government from which the claim is derived, the principles of equity, and the decisions of the supreme court of the United States, as far as they are applicable.

The decisions of the supreme court, mentioned in this section, evidently refer to decisions heretofore given in relation to titles in Louisiana and Florida, which were derived from the French or Spanish authorities, previous to the cession to the United States. And as these decisions must govern the case under consideration, as far as they are applicable, it is proper to state the principles upon which they were made, before we proceed to examine it. In doing this, however, we do not propose to refer separately to each of the numerous decisions which may be found in the reports; nor is it necessary. They will be found to have been uniformly decided upon certain fixed principles of law, applicable to those grants, which cannot always be applied with justice and equity to a case like the one before us. The laws of congress, giving the jurisdiction, were different in one respect; and the condition of the countries, as well as the laws and usages of the nation making the grants, were also different.

It will be seen, from the quotation we have made, that the 8th section embraces not only inchoate or equitable titles, but legal titles also; and requires them all to undergo examination, and to be passed upon by the court. The object of this provision appears to be, to place the titles to land in California upon a stable foundation, and to give the parties who possess them an

opportunity of placing them on the records of the country, in a manner and form that will prevent future controversy.

In this respect, it differs from the act of 1824, under which the claims in Louisiana and Florida were decided. The jurisdiction of the court, in these cases, was confined to inchoate equitable titles, which required some other act of the government to vest in the party the legal title or full ownership. If he claimed to have obtained from either of the former governments a full and perfect title, he was left to assert it in the ordinary forms of law, upon the documents under which he claimed. The court had no power to sanction or confirm it when proceeding under the act of 1824, or the subsequent laws extending its provisions.

And the language of the court, in passing judgment upon the claims in Louisiana or Florida, must always be understood as applying to cases in which the government still held the ownership of the land, and where the right of the party to demand a conveyance, upon principles of equity and good faith, must be shown by him, before he could claim it from the United States.

The mode and form of granting lands in these provinces, and the character and stability of the provincial governments, must also be considered, before we can determine how far the principles established in the decisions of those cases are applicable to the grants by the Mexican authorities, after the country was separated from Spain.

Grants of land in Louisiana and Florida were usually made in the following manner: The party who desired to form a settlement upon any unoccupied land presented his petition to the officer who had authority to grant, stating the quantity of land he desired, the place where it was situated, and the purposes to which it was to be applied. Upon the receipt of the petition, the governor, or other officer who had the power to grant, issued what is usually called a concession to the party, authorizing him to have the land surveyed by the official surveyor of the province. And it was the duty of this officer to ascertain whether the land asked for was vacant, or the grant of it would prejudice the rights of other parties ; and, if the surveyor found it to be vacant, and that the grant would not interfere with the rights of others, he returned a plat, or figurative plan, as it was called, and the party thereupon received a grant in absolute ownership.

These grants were almost uniformly made upon condition of settlement, or some other improvement, by which the interest of the colony, it was supposed, would be promoted. But until the survey was made, no interest, legal or equitable, passed in

the land. The original concession granted on his petition was a naked authority or permission, and nothing more. But when he had incurred the expense and trouble of the survey, under the assurances contained in the concession, he had a just and equitable claim to the land thus marked out by lines, subject to the conditions upon which he had originally asked for the grant. But the examination of the surveyor, the actual survey, and the return of the plat, were conditions precedent, and he had no equity against the government, and no just claim to a grant until they were performed; for he had paid nothing, and done nothing, which gave him a claim upon the conscience and good faith of the government. There were some cases, indeed, in which there were absolute grants of title with conditions subsequent annexed to them. The case cf Arredondo, reported in 6 Peters, and of which we shall speak hereafter, was one of this description. But the great mass of cases which come before this court, and which have been supposed to bear on this case, were of the character above mentioned.

It necessarily happened, from this mode of granting, that many concessions were obtained which the parties never afterwards acted on. A person who had contemplated a settlement, or planting a colony, or making some other improvement in a particular place, sometimes changed his mind, or found some other situation more suitable, or found himself unable to comply with the conditions which, in his petition, he had proposed to perform.

But these concessions or permissions were never recalled, and remained in the possession of the party, although he had abandoned all thoughts of acting upon them. And when the United States obtained the sovereignty of these countries, and the energy, enterprise, and industry of our citizens were rapidly filling it, and lands which were of no value under the Spanish government would be ample fortunes under the United States, many persons, who for years had held these concessions without attempting to avail themselves of the authority they gave him, came forward and claimed the right to do so under the government of the union.

A few cases, which appear to have been relied on in the argument in behalf of the United States, will show the character of most of them, and the principles upon which they were decided in this court. In the case of Boisdoré, (11 How. 63,) he had obtained the authority or concession on which he relied in the year 1783. He had never caused a survey to be made during the existence of the Spanish government, although twenty years had elapsed before its cession to this country.

Nor was any step taken by him to obtain a title from the United States, nor any claim legally brought forward, for seventeen years after the territory had been ceded to the United States. And nothing like any serious attempt had been made to fulfil the conditions upon which he had obtained the concession.

So, too, in the case of Glenn and others *v.* The United States, 13 How. 250, (usually called the Clamorgan case,) the grant was obtained in 1796, and no possession taken, and no survey had, nor any of the stipulations into which he had entered complied with, while the Spanish government lasted. Nor, indeed, was any claim made to it for several years after the cession to the United States; nor until the country in which it was situated was filling up with an industrious population, and the land becoming of great value.

So, again, in the case of Villemont against the United States, (13 How. 266,) the concession or authority was made in 1795, and there was an express provision in the concession, that unless the establishment he proposed in his petition was made on the land in three years, the concession should be null. Yet he did nothing during the continuance of the Spanish government, although it lasted eight years afterwards; and the excuse from Indian hostility could hardly avail him, because no difficulty of that kind is suggested in his petition; and from the character of the improvements he promised to make, it would seem that one of the objects of this large grant was to form an establishment which would be useful in repelling Indian hostilities from the neighboring Spanish settlements.

. This brief statement of the facts in these cases shows that the parties had acquired no right, legal or equitable, to these lands under the Spanish government. The instruments under which they claimed were evidently not intended as donations of the land, as a matter of favor to the individual, or as a reward for services rendered to the public. They were intended to promote the settlement of the territories, and to advance its prosperity. But up to the time when Spain ceded them, the parties had done nothing to accomplish the object, or to carry out the policy of the government. They had evidently no claim, therefore, upon the justice or conscience of the Spanish government. It had not granted them the land, and they had done nothing which, in equity, bound that government to make them a title. And when Spain ceded the territories to the United States, it held these lands as public domain as fully and amply as if those concessions or authorities had never been given; and the United States received the title in the same full and ample manner; neither the legal nor equitable right to them, as public domain, had been impaired

by any act of the Spanish authority, nor had any right been conveyed to or vested in the claimants.

It is proper to remark, that the laws of these territories under which titles were claimed, were never treated by the court as foreign laws, to be decided as a question of fact. It was always held that the court was bound judicially to notice them, as much so as the laws of a State of the Union. In doing this, however, it was undoubtedly often necessary to inquire into official customs and forms and usages. They constitute what may be called the common or unwritten law of every civilized country. And when there are no published reports of judicial decisions which show the received construction of a statute, and the powers exercised under it by the tribunals or officers of the government, it is often necessary to seek information from other authentic sources, such as the records of official acts, and the practice of the different tribunals and public authorities. And it may sometimes be necessary to seek information from individuals whose official position or pursuits have given them opportunities of acquiring knowledge. But it has always been held that it is for the court to decide what weight is to be given to information obtained from any of these sources. It exercises the same discretion and power, in this respect, which it exercises when it refers to the different reported decisions of state courts, and compares them together, in order to make up an opinion as to the unwritten law of the State, or the construction given to one of its statutes.

With these principles, which have been adjudicated by this court, to guide us, we proceed to examine the validity of the grant to Alvarado, which is now in controversy.

There can be no question as to the power of the governor of California to make the grant. And it appears to have been made according to the regular forms and usages of the Mexican law. It has conditions attached to it; but these are conditions subsequent. And the first point to be decided is, whether the grant vested in Alvarado any present and immediate interest; and, if it did, then, secondly, whether any thing done or omitted to be done by him, during the existence of the Mexican government in California, forfeited the interest he had acquired, and revested it in the government? For if, at the time the sovereignty of the country passed to the United States, any interest, legal or equitable, remained vested in Alvarado or his assigns, the United States are bound in good faith to uphold and protect it.

Now, the grant in question is not like the Louisiana and Florida concessions — a mere permission to make a survey in a particular place, and return a plat of the land he desires, with

47*

a promise from the government that he shall have a title to it when these things are done. But the grant, after reciting that Alvarado was worthy, for his patriotic services, to be preferred in his pretension for his personal benefit, and that of his family, for the tract of land ·known by the name of Mariposas, to the extent of ten square leagues, within certain limits mentioned in the grant; and that the necessary requirements, according to the provisions of the laws and regulations, had been previously complied with, proceeds, in the name of the Mexican nation, to grant him the aforesaid tract, declaring the same, by that instrument, to be his property in fee, subject to the approbation of the departmental· assembly and the conditions annexed to the grant.

The words of the grant are positive and plain. They purport to convey to him a present and immediate interest. And the grant was not made merely to carry out the colonization policy of the government, but in consideration of the previous public ar.d patriotic services of the grantee. This inducement is carefully put forth in the title papers. And, although this cannot be regarded as a money consideration, making the transaction a purchase from the government, yet it is the acknowledgment of a just and equitable claim.; and, when the grant was made on that consideration, the title in a court of equity ought to be as firm and valid as if it had been purchased with money on the same conditions.

It is argued that the description is so vague and uncertain that nothing passed by the grant; and that he had no vested interest until the land was surveyed, and the part intended to be granted severed by lines or known boundaries from the public domain. But this objection cannot be maintained. It is true, that if any other person within the limits where the quantity granted to Alvarado was to be located, had afterwards obtained a grant from the government, by specific boundaries, before Alvarado had made his survey, the title of the. latter grantee could not be impaired by any subsequent survey of Alvarado. As between the individual claimants from the government, the title of the party who had obtained a grant for the specific land would be the superior and better one. For, by the general grant to Alvarado, the government did not bind itself to, make no other grant· within the territory described, until after he had made his survey. But, as between him and the government, he had a vested interest in the quantity of land mentioned in the grant. The right to so much land, to be afterwards laid off by official authority, in the territory described, passed from the government to him by the execution of the instrument granting it.

This principle of law was maintained by the decision of this court, in the case of Rutherford v. Greene's Heirs, reported in 2 Wheat. 196. The State of North Carolina, in 1780, passed an act reserving a certain tract of country to be appropriated to its officers and soldiers; and in 1782, after granting 640 acres in the territory reserved to each family that had previously settled on it, and appointing commissioners to lay off, in one or more tracts, the land allotted to the officers and soldiers, proceeded to enact that 25,000 acres of land should be allotted for and given to Major-General Nathaniel Greene, his heirs and assigns, within the bounds of the lands reserved for the use of the army, to be laid off by the aforesaid commissioners, as a mark of the high sense the State entertained of the extraordinary services of that brave and gallant officer."

In pursuance of this law, the commissioners allotted 25,000 acres of land to General Greene, and caused the tract to be surveyed and returned to the proper office. The manner in which the title originated under which Rutherford claimed, is not very clearly stated in the case. The decision turned altogether on the validity of the title of General Greene, and the date at which it commenced. And the court said, that the general gift of 25,000 acres lying in the territory reserved, became, by the survey, a particular gift of the 25,000 acres contained in the survey. And, after examining the title very fully, the court in conclusion say: " It is clearly and unanimously the opinion of the court, that the act of 1782 vested a title in General Greene to 25,000 acres of land, to be laid off within the boundaries allotted to the officers and soldiers, and that the survey made in pursuance of that act, and returned March 3, 1783, gave precision to that title, and attached it to the land surveyed."

There was a further objection taken to the title of General Greene, upon the ground that, by the constitution of North Carolina, there should be a seal of the State to be kept by the governor and affixed to all grants. And it was objected, that this grant by the legislature had not the formality required by the constitution to pass the estate. But in answer to this, the court said that this provision was intended for the completion and authentication of an instrument attesting a title previously created by law. That it was merely the evidence of prior legal appropriation, and not the act of the original appropriation itself.

The principles decided in this case appear to the court to be conclusive as to the legal effect of the grant to Alvarado. It recognizes as a general principle of justice and municipal law, that such a grant for a certain quantity of land by the government, to be afterwards surveyed and laid off within a certain

territory, vests in the grantee a present and immediate interest. In the language of the court, the general gift becomes a particular gift when the survey is made; and when this doctrine has been asserted in this court, upon the general principles which courts of justice apply to such grants from the public to an individual, good faith requires that the same doctrine should be applied to grants made by the Mexican government, where a controversy arises between the United States and the Mexican grantee.

The act that the grant to General Greene was made by an act of assembly, did not influence the decision; nor did the court allude to it as affecting the question. It is the grant of the State, whether made by a special law of the legislature, or by the public officer authorized to make it.

Another objection has been made, upon the ground that the 8th article of the regulations of 1828 requires what is called a definite grant, signed by the governor, to serve as a title to the party interested, wherein it must be stated that the said grant is made in exact conformity with the provisions of the laws, in virtue whereof possession shall be given; and it is argued that no title passed until this definite grant was obtained. But this document is manifestly intended as the evidence that the conditions annexed to the grant have all been complied with. It is not required in order to give him a vested interest, but to show that the estate, conveyed by the original grant upon certain conditions, is no longer subject to them; and that he has become definitely the owner, without any conditions annexed to the continuance of his estate. It is like the patent required by the laws of North Carolina after the original grant to General Greene, which the court said was for the completion and authentication of an instrument attesting a title previously created by law; and, like the case of General Greene, Alvarado had a vested interest without it.

Regarding the grant to Alvarado, therefore, as having given him a vested interest in the quantity of land therein specified, we proceed to inquire whether there was any breach of the conditions annexed to it, during the continuance of the Mexican authorities, which forfeited his right and revested the title in the government.

The main objection on this ground is the omission to take possession, to have the land surveyed, and to build a house on it, within the time limited in the conditions. It is a sufficient answer to this objection to say, that negligence in respect to these conditions and others annexed to the grant does not, of itself, always forfeit his right. It subjects the land to be denounced by another, but the conditions do not declare the land

forfeited to the State, upon the failure of the grantee to perform them.

The chief object of these grants was to colonize and settle the vacant lands. The grants were usually made for that purpose, without any other consideration, and without any claim of the grantee on the bounty or justice of the government. But the public had no interest in forfeiting them even in these cases, unless some other person desired, and was ready to occupy them, and thus carry out the policy of extending its settlements. They seem to have been intended to stimulate the grantee to prompt action in settling and colonizing the land, by making it open to appropriation by others, in case of his failure to perform them. But as between him and the government, there is nothing in the language of the conditions, taking them all together, nor in their evident object and policy, which would justify the court in declaring the land forfeited to the government, where no other person sought to appropriate them, and their performance had not been unreasonably delayed; nor do we find any thing in the practice and usages of the Mexican tribunals, as far as we can ascertain them, that would lead to a contrary conclusion.

Upon this view of the subject, we proceed to inquire whether there has been any unreasonable delay, or want of effort, on the part of Alvarado to fulfil the conditions? For if this was the case, it might justly be presumed, as in the Louisiana and Florida concessions, that the party had abandoned his claim before the Mexican power ceased to exist, and was now endeavoring to resume it, from the enhanced value under the government of the United States.

The petition of Alvarado to the governor is dated February 23, 1844; and, after passing through the regular official forms requir d by the Mexican law, the grant was made on the 29th of the same month. According to the regulations for granting lands, it was necessary that a plan or sketch of its lines and boundaries should be presented with the petition; but, in the construction of these regulations, the governors appear to have exercised a discretionary power to dispense with it under certain circumstances. It was not required in the present instance. The reason assigned for it in the petition was, the difficulty of preparing it, the land lying in a wilderness country, on the confines of the wild Indians. This reason was deemed by the governor sufficient, and the grant issued without it; and in deciding upon the validity of a Mexican grant, the court could not, without doing injustice to individuals, give to the Mexican laws a more narrow and strict construction than they received from the Mexican authorities who were intrusted with their execution. It is the duty of the court to protect rights obtained under them,

which would have been regarded as vested and valid by the Mexican authorities. And as the governor deemed himself authorized, under the circumstances, to dispense with the usual plan, and his decision, in this respect, was sanctioned by the other officers intrusted with the execution of the law, it must be presumed that the power he exercised was lawful, and that the want of a plan did not invalidate the grant. The fact that the country where the land was situated was such a wilderness, and bordered by such dangerous neighbors, that no plan could then be prepared, is proved by these documents; and that fact, officially admitted, is worthy of consideration, when we come to the inquiry whether there was unreasonable delay in taking possession. For, by dispensing with the plan or draft on that account, which was a condition precedent, it may justly be inferred that the conditions subsequent were not expected by the governor to be performed, nor their performance intended to be exacted, until the state of the country would permit it to be done with some degree of safety.

Now, it is well known that Mexico, and California as a part of it, had, for some years before, been in a disturbed and unsettled state, constantly threatened with insurrectionary and revolutionary movements; and in this state of things, the uncivilized Indians had become more turbulent, and were dangerous to the frontier settlements, which were not strong enough to resist them. It is in proof that this state of things existed in the Mariposas valley when this grant was made; that it was unsafe to remain there without a military force; and that this continued to be the case until the Mexican government was overthrown by the American arms. In the very year of the grant, a civil war broke out in the province, which ended by the expulsion of the Mexican troops; and Colonel Fremont entered California at the head of an American force, in 1846, and the country was entirely subdued, and under the military government of the United States, in the beginning of 1847, and continued to be so held until it was finally ceded to the United States under the treaty of Guadaloupe Hidalgo. In February, 1847, while California was thus occupied by the American forces, Alvarado conveyed to Colonel Fremont.

Now, it is very clear, from the evidence, that during the continuance of the Mexican power it was impossible to have made a survey, or to have built a house on the land, and occupied it for the purposes for which it was granted. The difficulties which induced the governor to dispense with a plan when he made the grant, increased instead of diminishing. We have stated them very briefly in this opinion, but they are abundantly and in more detail proved by the testimony in the

record. Nobody proposed to settle on it, or denounced the grant for a breach of the conditions. And at the time when the Mexican authorities were displaced by the American arms, the right which Alvarado had obtained by the original grant remained vested in him, according to the laws and usages of the Mexican government, and remained so vested when the dominion and control of the government passed from Mexico to the United States. The same causes which made it impossible to take possession of the premises and obtain a survey, made it equally impracticable to obtain the approval of the departmental assembly. The confusion and disorder of the times prevented it from holding regular meetings. It is doubtful whether it met more than once after this grant was made; and its proceedings, from the state of the country, were necessarily hurried, and the assembly too much engrossed by the public dangers to attend to the details of private interests. It does not appear that the governor ever communicated this grant to the assembly. At all events, they never acted on it. And the omission or inability of the public authorities to perform their duty, cannot, upon any sound principle of law or equity, forfeit the property of the individual to the State. It undoubtedly disabled him from obtaining what is called a definitive title, showing that all the conditions had been performed; but it could not devest him of the right of property he had already acquired by the original grant, and revest it in the State.

And certainly no delay is chargeable to Alvarado or Fremont after California was subjected to the American arms. The civil and municipal officers, who continued to exercise their functions afterwards, did so under the authority of the American government. The alcalde had no right to survey the land or deliver judicial possession, except by the permission of the American authorities. He could do nothing that would in any degree affect the rights of the United States to the public property; and the United States could not justly claim the forfeiture of the land for a breach of these conditions, without showing that there were officers in California, under the military government, who were authorized by a law of congress to make this survey, and deliver judicial possession to the grantee. It is certain that no such authority existed after the overthrow of the Mexican government. Indeed, if it had existed, the principles decided in the case of Arredondo, 6 Pet. 745, 746, would furnish a satisfactory answer to the objection.

Two other objections on the part of the United States to the confirmation of this title remain to be noticed. The first condition annexed to the grant prohibits the grantee from selling, alienating, or mortgaging the property, or subjecting it to taxes,

entail, or any other incumbrances. And by the laws of Mexico, the grantee could not, it is said, sell or convey the land to any one but a Mexican citizen, and that Fremont was not a Mexican citizen at the time of the conveyance under which he claims.

In relation to the first objection, it is evident from the disturbed state and frequent revolutions in the province, that there was some irregularity in the conditions annexed to grants, and that conditions appropriate to one description of grant, from clerical oversight, or some other cause, were sometimes annexed to others. This is manifestly the case in the present instance; for this condition is in violation of the Mexican laws, and could not, therefore, be legally annexed to this grant. For by the decree of the Mexican congress of August 7, 1823, all property which had been at any time entailed, ceased to be so from the 20th of September, 1820, and was declared to be and continue absolutely free; and no one in future was permitted to entail it. And the prohibition in the 13th article of the regulations of 1824, to transfer property in mortmain, necessarily implies that it might be aliened and transferred in any other manner.

But if this condition was valid by the laws of Mexico, and if any conveyance made by Alvarado would have forfeited the land under the Mexican government as a breach of this condition, or if it would have been forfeited by a conveyance to an alien, it does not by any means follow that the same penalty would be incurred by the conveyance to Fremont.

California was at that time in possession of the American forces, and held by the United States as a conquered country, subject to the authority of the American government. The Mexican municipal laws, which were then administered, were administered under the authority of the United States, and might be repealed or abrogated at their pleasure; and any Mexican law inconsistent with the rights of the United States, or its public policy, or with the rights of its citizens, were annulled by the conquest. Now, there is no principle of public law which prohibits a citizen of a conquering country from purchasing property, real or personal, in the territory thus acquired and held; nor is there any thing in the principles of our government, in its policy or its laws, which forbids it. The Mexican government, if it had regained the power, and it had been its policy to prevent the alienation of real estate, might have treated the sale by Alvarado as a violation of its laws; but it becomes a very different question when the American government is called on to execute the Mexican law. And it can hardly be maintained that an American citizen, who makes a

contract or purchases property under such circumstances, can be punished in a court of the United States with the penalty of forfeiture, when there is no law of congress to inflict it. The purchase was perfectly consistent with the rights and duties of Colonel Fremont, as an American officer and an American citizen; and the country in which he made the purchase was, at the time, subject to the authority and dominion of the United States.

Still less can the fact that he was not a citizen of Mexico impair the validity of the conveyance. Every American citizen who was then in California had at least equal rights with the Mexicans; and any law of the Mexican nation which had subjected them to disabilities, or denied to them equal privileges, were necessarily abrogated without a formal repeal.

In relation to that part of the argument which disputes his right, upon the ground that his grant embraces mines of gold or silver, it is sufficient to say that, under the mining laws of Spain, the discovery of a mine of gold or silver did not destroy the title of the individual to the land granted. The only question before the court is the validity of the title. And whether there be any mines on this land, and, if there be any, what are the rights of the sovereignty in them, are questions which must be decided in another form of proceeding, and are not subjected to the jurisdiction of the commissioners or the court, by the act of 1851.

Some difficulty has been suggested as to the form of the survey. The law directs that a survey shall be made, and a plat returned, of all claims affirmed by the commissioners. And as the lines of this land have not been fixed by public authority, their proper location may be a matter of some difficulty. Under the Mexican government, the survey was to be made or approved by the officer of the government, and the party was not at liberty to give what form he pleased to the grant. This precaution was necessary, in order to prevent the party from giving it such a form as would be inconvenient to the adjoining public domain, and impair its value. The right which the Mexican government reserved to control this survey passed, with all other public rights, to the United States; and the survey must now be made under the authority of the United States, and in the form and divisions prescribed by law for surveys in California, embracing the entire grant in one tract.

Upon the whole, it is the opinion of the court that the claim of the petitioner is valid, and ought to be confirmed. The decree of the district court must, therefore, be reversed, and the case remanded, with directions to the district court to enter a decree conformably to this opinion.

Mr. Justice CATRON and Mr. Justice CAMPBELL dissented.

Mr. Justice CATRON dissenting.

On the 23d of February, 1844, Juan B. Alvarado petitioned the governor, Micheltorrena, for ten leagues of land, alleging that the tract which he then owned was not sufficient to support his stock of cattle, and which he was desirous to increase. He at the same time proposed to contribute to the spreading of the agriculture and industry of the country. And he further declared, that because of the good intentions of the governor in favor of the improvements of the country, the petitioner hoped for a favorable consideration of his demand.

The governor referred the petition to the alcalde of San José, who reported that the land was vacant, that the petitioner was meritorious, and that there was no objection ' J making the grant. In this report, Jimeno, the government secretary, concurred.

The governor declared the petitioner meritorious for his patriotic services, and therefore worthy of a preference ; and accordingly, on the 29th of February, 1844, proceeded to grant to Alvarado, for his personal benefit and that of his family, the tract of land known by the name of Mariposas, to the extent of ten square leagues, within the limits of the Snow Mountain, (Sierra Nevada,) and the rivers known by the names of the Chanchilles, of the Merced, and the San Joaquin, " the necessary requirements, according to the provisions of the laws and regulations having been previously complied with, subject to the approbation of the departmental assembly, and the following conditions — that is to say : —

1. " He shall not sell, alienate, nor mortgage the same, nor subject it to taxes, entail, or other incumbrance."

2. " He may inclose it, without obstructing the roads or the right of way. He shall enjoy the same freely, without hindrance, destining it to such use or cultivation as may best suit him ; but he shall build a house within a year, and it shall be inhabited."

3. " He shall solicit from the proper magistrate the judicial possession of the same, by virtue of this grant, by whom the boundaries shall be marked out, on the limits of which he (the grantee) shall place the proper landmarks."

4. " The tract of land granted is ten sitios de ganado mayor, (ten square leagues,) as before mentioned. The magistrate who may give the possession shall cause the same to be surveyed according to the ordinance, the surplus remaining to the nation for the proper use."

5. " Should he violate these conditions, he will lose his right to the land, and it will be subject to being denounced (pretended for) by another."

" Therefore, I command that these presents being held firm and binding, that the same be registered in the proper book, and delivered to the party interested, for his security, and other purposes."

The foregoing conditions, in effect, are imposed by the colonization law of 1824, and the regulations made in pursuance thereof, by the chief executive of Mexico, in 1828; both of which were equally binding upon the territorial governors, when they exercised the granting power.

The concession, according to these laws, could only be made for agricultural purposes and for raising cattle. Colonization was the great object of the law of 1824; and to this end alone was its execution prescribed and arranged by the regulations of 1828.

Much stress has been laid on the fact that, in the concession to Alvarado, patriotic services are referred to as a reason why a preference was given to the grantee in obtaining the land; that preference was founded on the 8th section of the act of 1824, which provides, " that in the distribution of lands, Mexican citizens are to be attended to in preference, and no distinction shall be made among these, except such only as is due to private merit and services rendered to the country." Private merit or public services could form no part of the consideration for grants made for the purposes of grazing and cultivating; nor had the governor of a territory power to grant for any other purpose. The 11th section of the act of 1824 reserved the power to the supreme executive to alienate lands in the territories in favor of civil or military officers of the federation. This grant, therefore, stands on the footing of others, and is subject to the same conditions. Alvarado's petition, and the governor's concession founded on it, must be taken together; they are a necessary part of the contract between the applicant and the government, under the colonization law of 1824, and the regulations of 1828, which, with inconsiderable exceptions, remained in full force when this concession was applied for and issued.

The government of the United States received the legal title to the public lands in California by treaty, and incumbered under the laws of nations with all the equitable rights of private property therein, that they were subject to in the hands of Mexico at the time of their transfer; and the question here is, what interest in the land claimed, Alvarado or his assignee had, when the treaty was made? The consideration for the grant was a performance of its leading conditions on the part of the grantee; the principal condition being, the inhabitation of the land, in the manner and within the time prescribed. As to the terms of this condition, the regulations of 1828 declare, that the party solicit-

ing for lands, shall describe, as distinctly as possible, by means of a map, the land asked for ; and a record shall be kept of the petitions presented and grants made, with the maps of the lands granted ; and the governor was required, by the 11th rule of the regulations, to designate to the colonist the time within which he was bound to cultivate or occupy the land ; " it being under-stood that if he does not comply, the grant of the land shall remain void ; " and by the 12th rule, the grantee was required to prove before the municipal authority that he had cultivated or occupied, so that a record should be made of the fact thus estab-lished, " in order that he might consolidate and secure his right of ownership, and have power to dispose freely of the land." Accordingly, certain conditions were inserted in the grant as part of it, by the second of which, the colonist was bound to build and inhabit a house on the land granted, within one year. This was, therefore, the time allowed from the date of the grant, for the fulfilment of the important condition on which an equita-ble claim to it arose.

In this case, the land was granted to Alvarado in February, 1844, and three years after, he conveyed to Colonel Fremont, the petitioner. No possession had been taken by Alvarado be-fore that time, nor any further act done to acquire a title, than the first step of obtaining the concession ; and if this step gave him an equity to have a perfect title from the Mexican govern-ment, then his equity is the same as against the United States.

In the first place, the 11th rule above cited declares that no right accrues to the colonist unless he occupies the land ; and in the next place, the act of congress of March 3, 1851, by the author-ity of which we are acting, declares, (§ 11,) that the board of commissioners and the courts, deciding on California land claims, shall be governed by the decisions of the supreme court of the United States, so far as they are applicable.

By these decisions, it has been settled for many years, that a Spanish concession, containing a condition of inhabitation and cultivation, the performance of which is the consideration to be paid for an ultimate perfect title, is void, unless the condition was performed within the time prescribed by the ordinances of Spain. It was so held in the case of the United States v. Wig-gins, 14 Pet. 350. And the opinion then given was followed in the cases of Buyck, 15 Pet. 222, and of Delespine, Ib. 319. But the rule was more distinctly laid down in the case of the United States v. Boisdoré, 11 How. 96. There the court said : " The grantee might have his land surveyed, or he might decline ; he might establish himself on the land, or decline ; these acts rested wholly in his discretion. But, if he failed to take possession, and establish himself, he had no claim to a title ; his concession or

first decree, in such case, had no operation. So the supreme court of Louisiana held, in Lafayette v. Blanc, 3 Louisiana Ann. Rep. 60, and, in our judgment, properly. There, the grantee never having had actual possession under his concession, the court decided that he could set up no claim to the land, at law or in equity. This case followed Hooter v. Tippett, 17 La. Rep. 109. We take it to be undoubtedly true, that, if no actual possession was taken, under a gratuitous concession, given for the purpose of cultivation, or of raising cattle, during the existence of the Spanish government, no equity was imposed on our government to give any consideration or effect to such concession, or *requête.*"

The case of Glenn et al. v. United States, 13 How. 259, maintains the same doctrine. It was there declared, that a promise of performance, (that is, to inhabit and cultivate,) on the part of Clamorgan, the grantee, was the sole ground on which the Spanish commandant made the concession; that actual performance, by cultivating the land, was the consideration on which a complete title could issue; and that so far from complying, Clamorgan never took a single step after his concession was made, and in 1809 conveyed for the paltry sum of fifteen hundred dollars; and, under these circumstances, (says the court,) we are called on to decide in his favor, according to the principles of justice; this being the rule prescribed to us by the act of 1824, and the Spanish regulations. The court, then, declares, that the claim had no justice in it, and to allow it would be to sanction an attempt at an extravagant speculation merely; referring to Boisdoré's case, as having established the principle that occupation was indispensable, and the real consideration of grants for purposes of inhabitation or cultivation.

But, it is insisted here that no possession was taken of the land, nor a survey of it made, because of the danger from hostile Indians in its neighborhood. If this were a valid excuse, then on the Indian borders grants would carry no substantial conditions with them. The point is settled in the cases of Kingsley, 12 Pet. 484, and of De Villemont, 13 How. 267, that where the hostility of Indians was alleged as an excuse for not occupying the land, and it appeared that the hostility existed when the grant was made, and was merely continued, that then the grantee could not be permitted to set up such an excuse.

Alvarado manifestly took the grant at his own risk, and if he did not intend to perform the condition of inhabitation, or could not do it, he must bear the consequences. To hold otherwise would be to subvert the manifest design of the colonization laws of Mexico, by reserving indefinitely, to single individuals,

48 *

large bodies of uncultivated and unoccupied lands, in the instance before us, amounting to fifty thous: md arpens.

It is, I think, impossible to exempt this claim from the settled doctrine, that occupation is a consideration indispensable to its validity. It is thus laid down in various instances, and especially in the cases above cited, of Boisdoré, of Glenn et al. and of De Villemont; nor can this claim be sustained, unless they are overruled, and the act of congress, declaring that this court is bound by them, disregarded. The district judge, who rejected this claim in California, held that he could not do so, and, in my opinion, held properly. I give the conclusion of his opinion as it is found in the record.

"But, in the case at bar, the time for making a settlement is limited to one year. So far as appears, Alvarado never even saw the tract he assumed to convey to Fremont, nor was any settlement effected by the latter until a year after the ratification of the treaty. It cannot be urged in this, as in other cases, that the grant was not made complete by the assent of the assembly, owing to accident or the neglect of the governor, for Alvarado himself says it could not be submitted to them without the diseno, or plan, which, on account of the hostilities of the Indians, he was unable to furnish, and yet the danger from that source existed at the time of his application, for he assigns it to the governor as a reason why the diseno did not accompany the petition.

" It is urged that the political disturbances of the country contributed to prevent the settlement; but I think it clear, from the evidence, that the principal, if not the only reason why it was not effected by Alvarado or Fremont until after the treaty, was the danger from the savages, and that this danger existed to substantially the same degree before and after the grant.

" Upon the whole, after a most careful consideration of this case, and with every desire to give the claimant the full benefit of every favorable consideration to which he is entitled, I have been unable to resist the conclusion that the cases of Glenn, of De Villemont, and of Boisdoré, lay down for me rules of decision applicable to this case, and from which I am not at liberty to depart."

2. The next question is, whether a concession, which is in fact a floating land warrant, seeking a location on any part of a large region of country containing nine hundred square miles, can be confirmed by this court, acting as it does, of necessity, in a judicial capacity? The assumption thus to locate the ten leagues asserts power in the claimant to have the land surveyed at his discretion, either in a body, or in single tracts, so that they adjoin each other at any point of the respective surveys; in the

latter form he did have them surveyed, and, in this form of location, the grant was declared valid by the board of commissioners.

I understand the Mexican laws as not to allow any such undefined floating claims. It is impossible to recognize them under the act of 1824, the object of which was to colonize particular tracts of land.

By that act, the petitioner was bound to describe the land asked for " as distinctly as possible, by means of a map," according to which it was granted; and next, he was required to solicit from the proper magistrate (usually the alcalde of the next pueblo) judicial possession of the land described; and this magistrate was required to survey and designate the boundaries, on the limits of which the party interested was bound to place proper landmarks. Now, that Alvarado had no separate interest to any specific tract of land, was admitted on the argument; but it was insisted that he was, and his assignee is, a tenant in common, with the government, in all the country situate in a region called Mariposas, lying within the limits of the Sierra Nevada, and the rivers known by the names of Chanchilles, of the Merced, and the San Joaquin. In any part of this large scope of country it is assumed the Mexican magistrate and surveyor could have laid off the ten leagues, and that the surveyor-general of California can do the same now.

This claim, standing on the concession alone, lost its binding operation in one year, and became void if the land was not designated within that time, unless the time was enlarged, or new conditions prescribed by the governor. So I understand the eleventh rule of the regulations of 1828.

To hold that the Mexican government designed to leave in force for an indefinite length of time large undefined concessions, that might be surveyed at the election of the claimant at any time and at any place, to the hindrance of colonization and to the destruction of other interests, is an idea too extravagant to be seriously entertained ; so far from it, the Mexican colonization laws contained more positive provisions, to the end of granting distinct and known tracts of land to colonists, than did any Spanish laws that have at any time been brought to the consideration of this court.

It is proper to remark that, by the Mexican laws, an assignee could not be put into possession of land by force of the first decree or concession. Alvarado alone could apply for judicial possession. By the 11th rule, a possession could be transferred when it was duly proved and recorded; but the alcalde could not recognize an assignee as a colonist, because by the 3d rule the governor was bound to judge of the fitness of the candidate,

and, having decided as to his fitness, the alcalde was held to an execution of that decision, and could not recognize an assignee.

We are here called on to award a patent for a floating claim of fifty thousand arpens of land in the gold region of California, to an assignee whose vendor claimed under the colonization laws of Mexico, but who never was a colonist, who never did a single act under his contract to colonize, and who, it is admitted, could not have obtained a definite title from the political department of the territory of California, to wit, from the departmental assembly, whose province it was to pass on and confirm grants to colonists.

At law, this claim has no standing; it cannot be set up in an ordinary judicial tribunal. It addresses itself to us as founded on an equity incident to it by mere force of the contract, no part of which was ever performed. The claim is as destitute of merit as it can be, and has no equity in it; nor is it distinguishable from that of Clamorgan, which was pronounced invalid in the case of Glenn et al. v. The United States.

If this claim is maintained, all others must likewise be, if the first step of making the concession is proved to have been performed by the acting governor; as no balder case than the one before us can exist in California, where the grant is not infected with fraud or forgery.

And this presents a very grave consideration, affecting preemption rights. The country in California is filled up with inhabitants cultivating the valleys and best lands, and where they rely almost as confidently on their government titles, founded on acts of congress, as if they had a patent for the land. No other American title is known in the State of California, except such as are founded on the preëmption laws.

These agricultural people are quite as much contractors with the United States as the Mexican grantees were contractors with their government. By the acts of March 3, 1853, and March 1, 1854, congress promised to each settler who was on the land March 1, 1854, or might settle on it within two years thereafter, 160 acres, to include his residence, at one dollar and twenty-five cents an acre. This was a policy to populate the country, which is yet in progress. That these occupants have an equitable interest, and hold the land as purchasers, is the settled doctrine of the department of public lands, which exercises jurisdiction over them. Much of labor and money has been expended on the faith that a preference-right was a safe title, and exempt from floating Mexican concessions, such as that made to Alvarado, and now in litigation here. And this was most natural. Incipient Mexican claims had no standing in an ordinary court of justice, and congress created special courts to try them,

and prescribed the laws and rules by which these courts should be governed in their adjudications; and among other rules it was provided, that the decrees of the supreme court of the United States should govern where they applied. They thus had given to them the force of a legislative enactment. These decisions apply as a governing rule most emphatically to the requirement of a specific location of Spanish claims, to which the court had held litigants with a strictness often complained of, but always necessary for the protection of the public and its alienees; and it was the necessary consequence that cultivators of the soil should believe themselves safe from the ruin that lurks in a floating claim, familiar even to western ploughmen, many of whom remember the history of exhausting and fierce litigation in their own families for the paternal hearth, and who relied on the firm and consistent decisions of this court to protect their new homes on the Pacific. Nor do I think that any preëmption right can be included in a survey of the Alvarado claim, so as to make the preference-right part of the land belonging to the grant, because Col. Fremont's claim has never been located, and our decree cannot disturb innocent owners until it is located. It was so held by this court, in the case of Menard *v.* Massey, 8 How. 309. And unless that case is disregarded, one having a preference-right cannot be deprived of his possession by this floating claim.

Mr. Justice CAMPBELL, dissenting.

The concession, upon which the decree in favor of the United States was pronounced, is for ten square leagues, to be located in a district of country which contains above one hundred square leagues. To the concession there is no plan or design to indicate the place of location; nor was there any survey, delivery of judicial possession, occupancy, or improvement, at any time prior to the treaty of Guadaloupe Hidalgo. The conditions to the validity of a grant prescribed by the laws of colonization of Mexico, and which were specifically annexed to the grant under consideration, made these necessary.

The case of Smith *v.* The United States, 10 Pet. 326, and many others where the doctrine of that case was applied, is, in my opinion, conclusive of this. The claim arose on a petition of St. Vrain to the governor-general of Louisiana, in November, 1795, praying for a grant, in full property to him and his heirs, of ten thousand superficial arpens, with the special permission to locate in separate pieces, upon different mines, of whatever nature they may be, without obliging him to make a settlement; which grant, as prayed for, was granted by the governor-general, in February, 1796.

The court, in that case, collect some of the principles which had been employed by the court in the settlement of claims under the treaties of Florida and Louisiana. "We have held," they say, "that, in ascertaining what titles would have been perfected if no cession had been made to the United States, we must refer to the general course of the law of Spain; to local usage and custom; and not what might have been done by the special favor or arbitrary power of the king or his officers."

"It has also been distinctly decided," they say, "in the Florida cases, that the land claimed must have been severed from the general domain of the king, by some grant which gives it locality by its terms, by reference to some description, or by a vague general grant, with an authority to locate afterwards by survey, making it definite; which grant or authority to locate must have been made befc ⌐ the treaty of cession, (that is, 24th January, 1818.)

The court then coming to the case under consideration, describes it as a "grant to vest in the petitioner a title in full property to all the lands in the province containing minerals, which he might at any time locate, in quantities to suit his own pleasure." "Its condition at the cession was precisely as it was at the date of the grant; there was no evidence that the grantee had done or offered to do any act, or made any claim or demand, asserting or affirming any right under the grant." The court say, that, at the date of the surrender of Louisiana, "there was not an arpen on which his right had any local habitation; until a location was made, it was a mere authority to locate, which he might have exercised at his pleasure, both as to time and place, by the agency of a public surveyor authorized to separate, lands from the royal domain by a survey pursuant to a grant, warrant, or order of survey.

"At the time of the cession, nothing had been so severed, either by a public or private surveyor, or any act done by which the king could in any way be considered as a trustee for St. Vrain, for any portion of the ten thousand arpens; and there was no spot in the whole ceded territory in which he had, or could claim, an existing right of property. An indispensable prerequisite to such right was some act by which his grant would acquire such locality as to attach to some spot; until this was done, the grant could by no possibility have been perfected into a complete title. It is clear, therefore, that the integrity of the public domain had in no way been affected by this grant, (in March, 1804,) at the treaty of cession."

Here was a grant, "in full property," from the highest political authority having the power to make grants — without con-

dition or limitation as to the manner or time of the survey — pronounced invalid, for the reason that, when the sovereign parted with the territory, it had no definite location nor limit.

The concession now before the court agrees with the one we have considered, as being indefinite, attaching to no particular spot in a large extent of territory. The Mexican governor of California declares it to be the property of the grantee by the letters then issued, not in full property, but as "subject to the approbation of the most excellent departmental assembly, and to conditions underwritten." Among these conditions are those of a survey and delivery of possession by a public officer, and occupancy and improvement in a limited period. For very nearly four years, while the land remained as the property of Mexico, no act was done, nor right asserted to any portion of the ten square leagues, and nothing was performed to distinguish them from any other part of the public domain. The integrity of the public domain in this district had never been disturbed at the treaty of Guadaloupe Hidalgo, even by a visit from the grantee.

The case of Rutherford v. Greene's Heirs, 2 Wheat. 196, does not conflict, in my judgment, with the case I have cited. The question in that case was, whether an act of a state legislature, appropriating a certain number of acres in a particular district of country, "to be allotted" by public officers named in the act, and, after that allotment was perfected, whether it amounted to a legal or equitable title, (for the case was in chancery,) to the particular lot of land, against a claimant under a subsequent entry or purchase from the State. To make that case parallel to this, the claim of the grantee should have rested upon the general grant only, without the completing process of the allotment. The analogy fails, in respect to the present case, at the point where the question of doubt is suggested.

In the case of Smith, this court considered the effect of the acts of the grantee, performed after the treaty of cession, towards locating the grant, and whether they had any relation back to the date of the title, so as to unite with it and give definiteness to it. And the court say, that the surveys must be performed by public officers, under a legal authority, as a public trust, and that this was the law of both the United States and of Spain. And that the United States, having acquired the territory by cession, were entitled to hold it discharged of all claims, where the specific lands could not be identified by the description in the grant, or a supplementary survey.

The doctrine of this case has been applied with uniformity by this court, in a long series of cases, some of which with a degree of strictness bordering upon severity. Lecompte v.

United States, 11 How. 119; United States *v.* King, 3 Ib. 773; S. C. 7 Ib. 833; United States *v.* Wiggins, 14 Pet. 334; Bissell *v.* Penrose, 8 How. 317.

The non-fulfilment of these conditions, it was competent to Mexico to overlook or to forgive.

It is probable that, in the lax administration of her laws, in the distant province of California, all investigation would have been avoided, if the cession to the United States had not been made. It is equally within the power of congress to remit the consequences attaching to the omissions, and to concede as a grace what, in California, might have been yielded from indolence or indulgence.

But congress has chosen to deal with the subject of titles in California, upon principles of law, embracing in that term the whole body of jurisprudence applicable to the subject; and that the solution of all the questions arising upon them shall be made by courts of justice acting upon their fixed rules of judgment. Among the guides it has directed us to follow are the decisions of this court in analogous cases. In my opinion, the cases I have cited control this case, and I do not feel at liberty to depart from what is to me their clear and manifest import.

## *Order.*

This cause came on to be heard 'on the transcript of the record from the district court of the United States for the northern district of California, and was argued by counsel. On consideration whereof, it is the opinion of this court that the claim of the petitioner to the land, as described and set forth in the record, is a good and valid claim; whereupon it is now here ordered, adjudged, and decreed by this court, that the decree of the said district court in this cause be and the same is hereby reversed, and that this cause be and the same is hereby remanded to the said district court for further proceedings to be had therein, in conformity to the opinion of this court.