UNITED STATES v. MAXWELL LAND GRANT Co. and others.[1]

(Circuit Court, D. Colorado. January 25, 1886.)

1. PUBLIC LANDS — MAXWELL LAND GRANT — EFFECT OF AFFIRMANCE BY CONGRESS OF SURVEYOR GENERAL'S REPORT — GRANT DE NOVO.

The surveyor general having stated that a grant was made of a tract with certain boundaries named, that he considered it a good and valid grant, and recommended its confirmation, and congress having thereupon confirmed it, such confirmation, according to the principle of Tameling v. Freehold Co., 93 U. S. 644, was equivalent to a grant de novo.

2. SAME — EFFECT OF SURVEYOR'S MISTAKE.

When boundaries of a grant are described, if the surveyors, without intending wrong, err in the application of the description to the surface, and so run the lines as to include a large tract not in fact within the grant, the government is not without remedy, even after grant.

3. SAME — EVIDENCE OF FRAUD SUFFICIENT TO WARRANT CANCELLATION OF PATENT — SUSPICION.

After the issue of patent no mere suspicion will justify its cancellation. The proof of wrong or mistake should be clear and satisfactory.

4. SAME — EVIDENCE OF FRAUD — PRIVATE SURVEY.

The procurement of a private survey, and the filing of the plat thereof with the land department, is no evidence of fraud or wrong-doing of the party concerned therein.

[1] Affirmed. See 7 Sup. Ct. Rep. 1015, 1271 See, also, 21 Fed. Rep. 19.

5. SAME--EFFECT AS TO FRAUD OF EFFORTS IN ONE'S OWN BEHALF.

A party cannot be adjudged a wrong-doer who simply asserts the full extent of the title he believes he has, and resorts to the only means left to him of ascertaining its true limits.

6. SAME—CASE OF THE GOVERNMENT NOT PROVED.

While the absolute correctness of the government survey of the grant may not have been demonstrated, the government has failed to show that it is not correct, and the probabilities are that it corresponds as nearly to the limits of the original grant as can ever be ascertained.

On Final Hearing.

*Wm. A. Maury,* Asst. Atty. Gen., U. S., *H. C. Hobson,* Dist. Atty., and *J. A. Bently,* for complainant.

*Frank Springer, Bela M. Hughes,* and *Chas. E. Gast,* for defendants.

BREWER, J. This is a bill filed by the government to set aside the patent to what is known as the "Maxwell Land Grant." The complainant rests its case upon two propositions: *First.* It claims that the extent of the original concession was only 22 square leagues, or about 96,000 acres, while the patent includes over 1,700,000 acres. This question was presented to me upon demurrer to the bill, and I then ruled upon it adversely to the government. The case is now submitted to me with all the testimony, and upon final hearing.

The learned counsel for the government have challenged my ruling, and again argued the question with zeal and ability. Notwithstanding, my opinion remains the same. I might properly leave the question to rest upon the considerations stated in the opinion then filed; yet, in view of the importance of the question, and the ability and earnestness of the reargument, I may be excused if I add something to what has already been said. In that opinion I rested my ruling upon the decision of the supreme court in the case of *Tameling* v. *Freehold Co.,* 93 U. S. 644. I held that case to be in point, and, if so, of course compelling the same conclusion. Counsel now both challenge that decision and also deny its application, seeking to distinguish the two cases. Of course I can entertain no thought of questioning that decision. If the supreme court have mistaken the law, they, and they alone, can correct the mistake. The circuit court must follow its superior, and that, too, not with any carping spirit or desire to evade the full force of any of that court's decisions. In the *Tameling Case,* which was a case in which the out-boundaries of the grant known as the "Sangre de Christo" grant included a tract largely in excess of the 22 leagues which it is claimed was, under the Mexican colonization law, the limit of the legal grant, the supreme court held that the act of congress confirming the grant was as effectual as a grant *de novo,* and conveyed the title to the whole tract. I quote its language:

"It is obviously not the duty of this court to sit in judgment upon either the recital of matters of fact by the surveyor general, or his decision declaring the validity of the grant. They are embodied in his report, which was laid before congress for its consideration and action. We need only say that

he distinctly set forth that Luis Lee and Narciso Beaubien, September 27, 1843, petitioned the then civil and military governor of New Mexico 'for a grant of land in what is now the county of Taos, embracing the Costilla, Culebra, and Trinchera rivers, including the Rito of the Indians, and Sangre de Christo to its junction with the Del Norte river;' that the petition was referred by the governor to the prefect, with instructions to give the possession asked for by the petitioners; that they were put in possession, with the boundaries contained in the petition, 'vesting in them, their children and successors, a title in fee to said lands.' After stating that by the death of one of the grantees his heir at law, Charles Beaubien, inherited the undivided half of the land, and that he acquired the remainder from the administrator of the other grantee, the surveyor general reaches the conclusion that the grant is a good and valid one, and that a legal title vests in Charles Beaubien to the land embraced within the limits contained in the petition. The grant was approved and recommended for confirmation by congress. Congress acted upon the claim 'as recommended for confirmation by the surveyor general.' The confirmation being absolute and unconditional, without any limitation as to quantity, we must regard it as effectual and operative for the entire tract. The plaintiff in error insists that under the Mexican colonization laws, in force when the grant was made, not more than 11 square leagues for each petitioner could be lawfully granted. As there were in the present instance but two petitioners, and the land within the boundaries in question is largely in excess of that quantity, the invalidity of the grant has been earnestly and elaborately pressed upon our attention. This was matter for the consideration of congress, and we deem ourselves concluded by the action of that body. The phraseology of the confirmatory act is, in our opinion, explicit and unequivocal. In *Ryan* v. *Carter*, 93 U. S. 78, we recognized and enforced, as the settled doctrine of this court, that such an act passes the title of the United States as effectually as if it contained in terms a grant *de novo*, and that a grant may be made by law, as well as by a patent pursuant to law."

Counsel for the government concede that the proceedings in the two grants, up to the report of the surveyor general to congress, are substantially alike. The admission is too narrow. The prior proceedings in respect to the Maxwell grant much more clearly indicate an intent to grant the entire tract. The petition was for *the* tract of land described by the boundaries, "to be divided equally between us." In the *Sangre de Christo Case* the petition, after stating that petitioners had examined the tract "embraced within the Costilla, Culebra, and Trinchera rivers, including the Rito of the Indians, and the Sangre de Christo to its junction with the Del Norte river," prays the governor "to grant us the possession of *a* tract of land to each one, within the aforementioned boundaries." Both petitions were sustained, and the grants ordered accordingly, no description of amount of land or boundaries being given in the orders. So, upon the face of the papers, it could with more force be asserted that the intent in the *Maxwell Case* was to grant the entire tract. Further, in the *Maxwell Case*, and in that only, objections having been interposed to the grant, the matter was referred to the departmental assembly, and the grant was by it confirmed as according to report, not alone for the benefit of the grantees, but also for the sake of the colony which they proposed to place upon it.

But assuming perfect similarity between the two cases up to the surveyor general's reports, how does the matter then stand? Both confirmations were by the same act of congress,—an act approved June 15, 1860, "To confirm certain private land claims in the territory of New Mexico." The first section, which is the confirming section, reads as follows:

"Be it enacted by the senate and house of representatives of the United States of America, in congress assembled, that the private land claims in the territory of New Mexico, as recommended for confirmation by the surveyor general of that territory, and in his letter to the commissioner of the general land-office, of the twelfth of January, 1858, designated as Nos. 1, 3, 4, 6, 8, 9, 10, 12, 14, 15, 16, 17, and 18; and the claim of E. W. Eaton, not entered on the corrected list of numbers, but standing on the original docket and abstract of returns of the surveyor general as No. 16,—be, and they are hereby, confirmed: provided, that the claim No. 9, in the name of John Scolley and others, shall not be confirmed for more than five square leagues, and that the claim No. 17, in the name of Cornelio Vigil and Ceran St. Vrain, shall not be confirmed for more than eleven square leagues to each of said claimants."

Claim No. 4 is the Sangre de Christo grant, and No. 15 the grant in controversy. The act, it will be perceived, confirms the claim "as recommended for confirmation by the surveyor general." The recommendation in the *Sangre de Christo Case* is as follows:

"The grant being a positive one, without any subsequent conditions attached, and made by a competent authority, and having been in the possession and occupancy of the grantees and their assigns from the time the grant was made, it is the opinion of this office that the grant is a good and valid one, and that the legal title vests in Charles Beaubien to the land embraced within the limits contained within the petition. The grant is therefore approved by this office, and transmitted to the proper department, with the recommendation that it be confirmed by the congress of the United States."

In the *Maxwell Case,* "the grant, having been confirmed by the departmental assembly, and been in the constant possession of the grantees from the date of the grant until the present time, as is proven by the testimony of witnesses, it is the opinion of this office that it is a good and valid grant, according to the laws and customs of the government of the republic of Mexico and the decision of the supreme court of the United States, as well as the treaty of Guadaloupe Hidalgo, of February 2, 1848, and is therefore confirmed to Charles Beaubien and Guadaloupe Miranda, and is transmitted for the action of congress in the premises."

In both cases *the* grant is recommended for confirmation, not *a* grant. In both cases the prior recitals show a grant of the entire tract,—of a tract within the out-boundaries. In both cases it is obvious that the out-boundaries included much more than 22 leagues, though in neither was the exact area known. Counsel notice these differences. In the *Tameling Case* the surveyor general, prior to his recommendation, states that "the justice of the peace, Jose Miguel Sanchez, placed the parties in possession of the land, with the boundaries contained in the petition, vesting in them, their children and

successors, a title in fee to said lands.    While in this case the state-
ment is simply that the justice of the peace placed the parties in pos-
session of the land granted, I cannot see how this difference affects
the question or limits the scope of the recommendation.    The reason
for the difference is obvious from facts heretofore stated.    The grant in
the one case was of a tract *within* certain boundaries, and the other
of a tract *with* certain boundaries.    Juridical possession alone de-
fined the boundaries of the former, and, of course, the fact, extent,
and effect of such act were necessarily more important.

Again, in the *Tameling Case,* in justification of his recommenda-
tion, the surveyor general states:

"The supreme authorities of the remote province of New Spain, afterwards
the republic of Mexico, exercised from time immemorial certain prerogatives
and powers, which, although not positively sanctioned by congressional en-
actments, were universally conceded by the Spanish and Mexican govern-
ments; and, there being no evidence that these prerogatives and powers were
revoked or repealed by the supreme authorities, it is to be presumed that the
exercise of them was lawful.    The subordinate authorities of the provinces
implicitly obeyed these orders of the governors, which were continued for so a
long period, until they became the universal custom or unwritten law of the
land, wherein they did not conflict with any subsequent congressional enact-
ment.    Such is the principle sanctioned by the supreme court of the United
States, as expressed in the case of *Fremont* v. *U. S.*, 17 How. 542, which de-
cision now governs all cases of the same nature."

Nothing of the kind appears in this case; but the Tameling report
was made some months before this.    The reasons having been once
given, what need of incorporating them in every report?    If the
opinion of the surveyor general had changed as to the law, or if this case
did not come within the scope of that rule, we should expect express
notice and declaration thereof.    But these are preliminary matters.
The main fact is that he states that a grant was made of a tract with
certain boundaries, which he gives; that he considered it a good and
valid grant, and recommends its confirmation.    Congress, acting on
that recommendation, confirms it.    The *Tameling Case* declares such
confirmation equivalent to a grant *de novo.*    It seems to me that ends
the controversy.

I make no further comment on this question, simply referring for
additional discussion of it to the opinion filed on the demurrer.

*Secondly.* Assuming that the act of congress confirmed the grant
as of the entire tract within the out-boundaries, the government in-
sists that the patent includes some hundreds of thousands of acres
outside those boundaries, and that such excess was obtained by fraud
and mistake.    This question was also presented and considered be-
fore; not then as a question of fact, but one of law.    The defendant
claimed that as the fraud charged in the bill was imputed to the sur-
veyors alone, and no improper relations asserted between them and
the defendants, the government could take no advantage of this wrong
on the part of its officers; that, if any mistake was made in the sur-

vey, it was made by government officers; and that, as the government assumed the right of making a survey, it took all the risks of mistake, and therefore that after patent the government was concluded, and could claim nothing by reason of any wrong and mistake of its agents and officers.    I ruled against the defendant on these propositions.

Since the decision of the demurrer, and in the case of *U. S.* v. *Minor,* 114 U. S. 233, S. C. 5 Sup. Ct. Rep. 836, the supreme court has held that, where a patent has been obtained by fraud and imposition on the part of the claimant, the government is entitled to relief as against him.    I quote from the opinion:

"When, therefore, he [the claimant] succeeds by misrepresentation,—by fraudulent practices aided by perjury,—there would seem to be more reason why the United States, as the owner of the land of which it had been defrauded by these means, should have remedy against that fraud,—all the remedy which the courts can give,—than in the case of a private owner of a few acres of land on whom a like fraud had been practiced; * * * but in proceedings like the present,—wholly *ex parte,* no contest, no adversary proceedings, no reason to suspect fraud, but where the patent is the result of nothing but fraud and perjury—it is enough to hold that it conveys the legal title; and it would be going quite too far to say that it cannot be assailed by a proceeding in equity, and set aside as void, if the fraud is proved, and there are no innocent holders for value.    We have steadily held that though, in the absence of fraud, the facts were concluded by the action of the land department, a misconstruction of the law, by which alone the successful party obtained the patent, might be corrected in equity, much more when there was fraud and imposition."

It follows from this that if there be intentional wrong on the part of the surveyors, known to the claimants, although not incited by them, the same rule applies.    I go further, and hold, as I did on the demurrer, that when the the boundaries of a grant are described, if the surveyors, without intending wrong, err in the application of the description to the surface, and so run the lines as to include a large tract not in fact within the grant, the government is not without remedy, even after patent.    No trifling errors, it is true, will justify interference with the patent.    And if the calls in the description are indefinite, such that they may be answered in two or three ways, doubtless the decision of the land department would conclude the government.    There would then exist a question of fact only, committed to that department, and the decision of that tribunal would be without appeal, and not subject to review.    It may also be added that after the issue of patent no mere suspicion will justify its cancellation.    The proof of wrong or mistake should be clear and satisfactory.    Sanctity of legal titles calls for this; the good faith of the government requires it.    Now, what is the testimony by which the government has sought to establish its charges of fraud and mistake? A large volume has been taken.    Most careful and thorough surveys and resurveys have been made.    A score or more of plats and maps have been prepared with the utmost pains, and embracing the most

minute details. No expense has been spared. The government has, as it ought to have done, in view of the magnitude of the interests involved, as well as the gravity of the charges it made, been most diligent in collecting and producing every fact which could throw light upon the questions. All these have been placed before me, supported by arguments of exceptional force and clearness, and showing perfect mastery of all details. I have given long and patient study, and the conclusion to which I have arrived is in my own mind perfectly clear and satisfactory. I cannot, of course, review the testimony of the various witnesses. The limits of an opinion forbid; nor can I, without incorporating some of the plats, make perfectly clear to others the arguments which to me are convincing. All I can hope to do is to notice some of the more salient features of the case, and the facts which are most patent and potent.

The original petition of Beaubien and Miranda, in January, 1841, as translated, contains this description:

"The tract of land we petition for to be divided equally between us commences below the junction of the Rayado river with the Colorado, and in a direct line towards the east, to the first hills, and from there running parallel with said river Colorado, in a northerly direction, to opposite of the point of the Una de Gato; following the same river along the same hills, to continue to the east of the said Una de Gato river to the summit of the table-land, (*mesa;*) from whence turning north-west to follow along said summit, until it reaches the top of the mountain which divides the waters of the rivers running towards the east from those running towards the west; and from thence following the line of said mountain in a southwardly direction, until it intersects the first hills south of the Rayado river; and following the summit of said hills towards the east, to the place of beginning."

The report of CORNELIO VIGIL, the justice of the peace who in 1843 gave juridical possession, states that he "proceeded to erect the mounds according as the land is described in the accompanying petition, and which corresponds with the plat, to which I attach rubric; and commencing on the east of Rayado river a mound was erected; from whence, following in a direct line in an easterly direction to the first hills, another mound was erected at the point thereof; and, continuing from south to north, on a line nearly parallel with Red river, a third mound was erected on the north side of the Chicorica or Chacuaco *mesa*, (table-land;) thence, turning towards the west and following the side of the said table-land of the Chacuaco to the summit of the mountain, where the fourth mound was erected; from thence, following along the summit of the said Main ridge, from north to south, to the Cuesta del Osha, 100 varas north of the road from Fernandes to the Laguna Negra, where the fifth mound was erected; from thence, turning again to the east towards Red river, and following along the southern side of the table-lands of the Rayado and those of Gonzalitos, on the eastern point of which the sixth mound was erected; from whence, following in a northerly direction, I again reach Rayado river on its western side, where the seventh and last

mound was erected opposite to the first, which was erected on the eastern side."

With this report was filed a *desino* or sketch map of the grant, quite rude and inartistic, it is true, but giving, in a rough way, the outlines and form of the tract. The survey of Elkins and Marmon, upon which the patent was based, was made in the fall of 1877, more than 36 years after the original grant, and more than 34 years after the giving of juridical possession. Now, in determining whether this survey is correct, obviously several distinct lines of testimony are possible. *First.* By ascertaining the correct geographical location of the places, streams, etc., mentioned, and the correct topographical conditions referred to in the description, and inquiring whether the lines of survey fully and accurately respond to such calls. *Second.* By comparing the rude *desino* or sketch map with the plat of the survey. *Third.* Evidence of the continued existence and location of the mounds erected by the justice of the peace at the time of giving juridical possession. *Fourth.* In the case of the disappearance of such mounds, testimony of witnesses who saw them erected as to their location. *Fifth.* Comparison of the lines of survey with the boundaries of other grants made at or near the same time. *Sixth.* The extent of the actual occupation and claim of possession and title during the intervening years on the part of the claimants. These are the principal lines of inquiry.

At the outset, this fact is prominent: there is no minuteness of description in the original papers; the language is vague and general. Nor is this to be wondered at. The parties were dealing with a tract almost an empire in size, in a region of country unoccupied, but little known, and deemed of but trifling value. The donor was willing that the donees should take almost anything they desired, looking for consideration only to the occupation and development of this outlying territory. Again, it must be remarked that no serious challenge is made of the west and south lines of this survey. The questions are concerning the east and north lines, especially the latter.

Coming now to these lines of inquiry, in the grant the line commences at the first hills east of the Colorado river, below its junction with the Rayado, "and from there running parallel with said river Colorado, in a northerly direction to opposite the point of the Una de Gato; following the same river along the same hills, to continue to the east of said Una de Gato river to the summit of the table-land; from whence, turning north-west, following along said summit until it reaches the top of the mountain, which divides the waters of the rivers running east from those running towards the west."

In the certificate of juridical possession, after stating the erection of a mound at the first hills, the description reads:

"And continuing from south to north, on a line nearly parallel with Red river, a third mound was erected on the north side of the Chicorica or Chacuaco *mesa*, (table-land;) thence turning towards the west, and following along

the side of the said table-land of the Chacuaco to the summit of the mountain, where the fourth mound was erected."

The language of these two descriptions is not the same. Juridical possession was like feoffment at common law,—both a delineation of boundaries and an investiture of title. Under these circumstances, in case of conflict between the two, the juridical possession would control, at least, so far as it operated to reduce the extent of the tract conveyed. I notice the difference, however; as the language in the grant was doubtless the basis of the Griffin survey in 1870, of which I shall have more to say hereafter.

On the *desino* heretofore referred to, the Colorado, which is the principal stream within this tract, runs in a northerly course from the south-east corner about three-quarters the length of the tract, then bends sharply to the west. At this bend the Una de Gato is represented as continuing northerly in about the same direction as the Colorado below the bend. The east line of the tract is straight, and substantially parallel with the Colorado and the Una de Gato, to the north-east corner. As a matter of fact, by all the testimony, the stream which has been known all these years as the Una de Gato does not enter the Colorado at the bend, and does not run in a northerly direction, but branches off about midway between the north and south lines of the tract, and runs in a north-easterly direction. Following the language of the grant, Griffin, in his survey, did not make his east line continuously straight; but turning eastward, just below the mouth of the Una de Gato, followed the hills to the south and east of it, and so included some 100,000 and more acres in the tract. Elkins and Marmon, in obedience to instructions from the surveyor general, run their east line in a straight course, and so as to exclude this Una de Gato body of land.

Counsel for defendants insist that this action of the surveyor general and the surveyors was erroneous, and that the grant really included this body of land. Of course, even if their claim was beyond doubt, no relief could be given them in this action. I notice it to show that, in making its official survey, the government did not follow a course which might be justified by the words of the grant, but kept to the narrower boundaries indicated by the description in the certificate of juridical possession and the accompanying *desino*. Of this, of course, plaintiff is in no position to complain; but after all, the bone of contention is the location of the north-east corner. By the grant it was to be found by following the hills east of the Una de Gato to the summit of the table-land. In the juridical possession certificate it is located on the north side of the Chicorica or Chacuaco *mesa*. Where was the Chicorica or Chacuaco *mesa*, as known in the days of this grant? There is some testimony tending to show that there were two *mesas* which at times passed by the name of "Chicorica,"—the large and the small Chicorica *mesa*. Obviously the small *mesa*, even if generally known as the Chicorica, was not the place re-

ferred to by the justice, VIGIL, as it is below the bend of the Colorado. Many witnesses testify as to their understanding of the location of the Chicorica *mesa*. Perhaps a brief consideration of the general topography of the country will assist. At about the line between Colorado and New Mexico, from the main northern and southern range of mountains, a spur or ridge runs eastward, known as the Raton mountains. A short distance west of the east line of the grant is the Raton pass, now traversed by the Atchison, Topeka & Santa Fe railroad track. A little east of this is a high peak known as "Raton" or "Fisher's" peak. This is on the north line of the survey. From this, looking south-easterly, there appears, according to the testimony, an extensive plateau, descending as you move south and east. From the vicinity of the peak it seems to be a continuous plateau, but upon crossing it it is found to be broken by canons into plateaus. On the northern slope or ridge of this extended body of plateaus is the north-east corner-stone of the survey. In the canons which break up this tract into separate plateaus the various branches of Chicorica creek head. These various plateaus now pass by different names, though there is not perfect certainty or harmony between the witnesses as to the names applied to them. What more natural at that early day, when this country was seldom visited, its topography ill-known,—when it was known, however, that Chicorica creek headed somewhere in this tract, and when from such an elevation as Fisher's peak, near the mouth of one of the traveled passes, there seemed stretching away to the south and east this large plateau,— than that the whole of it should be known as the "Chicorica *Mesa.*" So some of the witnesses testify, and their testimony accords with inherent probabilities. Again, while some limit the name "Chicorica" to the southern portion of the tract above referred to, and say that the northern part is known as the "Raton," the "Ahogedra," or "San Francisco" *mesa;* yet it is clear that at least the last two names are of later date than the grant. Again, the language of both the grant and the juridical certificate indicates the northern position of the table-land as the true north-east corner. By the grant the line is to follow the hills east of the Una de Gato to the summit of the table-land. As the general trend from Fisher's peak is downward to the south and east, the summit would be reached only at the northern edge. By the juridical certificate the mound was erected on the north side of the Chicorica or Chacuaco *mesa*, and thence the line turned towards the west, and followed the side of the table-land to the summit of the mountain. One would naturally infer from this that the mound was located on the northern slope of the highlands, and that the north line ran along the same slope of the Raton range to the summit of the continental chain. Further, though perhaps less satisfactory, as being evidence of a later date, the economic and geologic maps of Colorado, prepared and issued by the interior department from the surveys of Prof. Hayden, locate the Chicorica *mesa*

north of the Colorado line, and where the north-east corner-stone was fixed by the survey. The same is true of Nell's topographical and township map of Colorado, which purports to be compiled from government surveys.

I do not know that further detail on this point would be of any value. The location and extent of the Chicorica *mesa* are not established beyond doubt. The probabilities are that the name was applied to the whole country, whose general trend, as I have stated, was down from Fisher's peak to the south and east, and not to any particular plateau into which that tract is broken by the various canons. Indeed, the general application of this term to the whole tract is made more obvious by its connection with the Chacuaco; for the Chacuaco creek was 15 to 20 miles east of Fisher's peak, and the term "Chacuaco *Mesa*" was, at least in the later days, applied to the lower portion of this descending tract in the vicinity of the creek. One thing is clear: it is not proven that any other tract, or any particular plateau of this tract, was known as "Chicorica *Mesa*." So that, if it cannot be affirmed that the description demonstrates the correctness of the survey, the latter is certainly consistent with the former, so far as any conclusion can be reached from the testimony as to the location of Chicorica *mesa*.

*Second.* The *desino* throws some light on the question, mainly as indicating that the eastern boundary was a straight line, to that extent making against the Griffin survey; and the deflection to encompass the Una de Gato and its hills. It also suggests this. From the fact that about the only geographical features disclosed within the limits are the water-courses, and from those as shown on the plat, it is apparent that the purpose was to include the country watered by the upper Colorado and its branches, and that the country watered by the Animas river and its branches, was not thought of. It does not, however, conflict with the idea that the northern boundary was to extend to the very edge of the table-lands north of the Raton mountains, as indicated by other testimony.

The third and fourth matters may be considered together. Here we have positive testimony. Jesus Silva was one of the party who went with the justice, VIGIL, when juridical possession was given, and the only living member of that party. He testifies to his traveling with them; locates the north-east corner where the government survey fixed it; testifies that he pointed out the mound twice in 1870 to Griffin, who rebuilt it; and that he pointed out the rebuilt mound in 1877 to Elkins and Marmon. Richens L. Wooten, who was not of VIGIL's party, testifies that he was present, and saw this northeast corner located, and he positively identifies it. The testimony of these witnesses is hard to disbelieve. It is true they do not agree fully as to the circumstances under which VIGIL's party met Wooten; nor is this strange, testifying after the lapse of forty years; but they do agree as to the location of the mounds. The recollection of these

witnesses is as distinct, and their narration of the general facts respecting VIGIL and his party, the location of the mounds, and the grant of juridical possession apparently as accurate, as could be expected in respect to so remote a transaction. If they are to be believed, there is an end to the controversy. Other testimony shows that Silva at that time was in the employ of Beaubien, one of the grantees, and as a hunter likely to be employed to accompany such an expedition. I place great reliance on the testimony of these witnesses, mainly because it tends to make definite and sure that which otherwise seemed only probable and indefinite. They have not been impeached in the slightest degree, and the general trend of the testimony supports their statement.

*Fifth.* Here my attention is called to what is popularly known as the "Las Animas Grant,"—a grant made December 8, 1843, to Ceran St. Vrain and CORNELIO VIGIL, the latter being the justice of the peace who in the forepart of that year had given juridical possession to Beaubien and Miranda. On January 2, 1844, juridical possession was given by JOSE MIGUEL SANCHEZ, justice of the peace. The section in the juridical certificate reads as follows:

"Commencing on the line north of the lands of Beaubien and Miranda, at one league east of the Animas river, a mound was erected; thence, following in a direct line to the Arkansas river, one league below the junction of the Animas and the Arkansas, a second mound was erected on the banks of said Arkansas river; and following up the Arkansas to one and one-half leagues below the junction of the San Carlos river the third mound was erected; thence, following in a direct line to the south, till it reaches the foot of the first mountain, two leagues west of the Huerfano river, the fourth mound was erected; and, continuing in a direct line to the top of the mountain, to the source of the aforementioned Huerfano, the fifth mound was erected; and, following the summit of the said mountain in an easterly direction, till it intersects the line of the lands of Miranda and Beaubien, the sixth mound was erected; from thence, following the dividing line of the lands of Miranda and Beaubien, in an easterly direction. I came to the first mound which was erected."

This, then, was a grant of land adjacent to and on the north of the Beaubien and Miranda grant. In 1863 the claimants caused a private survey to be made by one Thomas Means, a deputy United States surveyor for the territory of New Mexico. In making this survey the surveyor erected mounds at the corners. It seems from the testimony that, according to the location of these mounds, the south line of this grant was south of the north line of the survey of the grant in controversy. In other words, the north line of the survey and patent was carried too far north. I do not see that this survey and plat of Means challenges the correctness of Elkin's and Marmon's location of the north-east corner of the Beaubien and Miranda grant. Indeed, it rather sustains it; for on the plat the table-land lying east of Raton or Fisher's peak is designated as "Chicorica *Mesa.*" The interference is rather on the western part of the north line. The Las Animas river is the significant geographical feature on this part of

the two plats. Its general course is from east to west, with something of a bow to the south.

Means' survey of the Las Animas grant carries its south line entirely south of this river, giving to the grant the whole of the Las Animas valley. Obviously, from the plat, this line was not run on the summit of the Raton mountains, but along the northern border of the highlands north of the mountains. Griffin, in his private survey of the Beaubien and Miranda grant, made the west half of his north line perfectly straight, and thus crossed to the north side of the Animas river at the bow above mentioned, making a portion of the Animas valley a part of the Beaubien and Miranda grant, while Elkins and Marmon, in their survey, ran this line entirely south of the Animas river, leaving out of the grant quite a territory which Griffin had included. It is true, judging from the plats and testimony, they ran this boundary line nearer the Animas river than did Means. The difference in the distance from the river of the two lines I am unable to state positively; but, obviously, there is some conflict between them. Means' survey, therefore, is testimony against the correctness of the survey and patent, so far as this part of the north line is concerned. It must be borne in mind that both the Means and Griffin surveys were private surveys, made at the instance of claimants, and without the sanction of official responsibility; made also a score of years and more after the grants and juridical possession, and by surveyors who had only recently come into the country, and who obviously had no more, if as much, as is now presented, to aid in determining the true lines. Further, the testimony shows that in the first instance the boundaries of neither tract were marked out with any degree of accuracy. All that was attempted to be done was to mark the corners and indicate in a general way the intermediate lines. It cannot now be positively determined which, if either, of these lines is absolutely correct. A question of fact was open to the government, and the determination of the official surveyors, approved by the land department, must be held decisive. If I were to set aside this survey, and order a new one, I do not see from the testimony how or where I could order the new line to run. Under those circumstances the courts must accept the determination of the land department as final and conclusive.

Counsel for defendants have, on a map of Colorado, drawn a rough sketch of the Sangre de Christo, Las Animas, and that portion of the Beaubien and Miranda grant lying in that state. This sketch, while it does not harmonize with the government survey, is certainly curious and suggestive,—suggestive that the intended boundaries of the latter grant may really have extended further north by many miles than have been given by survey and patent.

*Sixthly.* In reference to occupation little need be said. The tract was never inclosed. There were but two or three settlements within its limits. It was a vast, open, unoccupied body of land. So far as

respects the claims of the owners there is testimony that at two or three times Maxwell, who came into the country years after the grant, married the daughter of one of the grantees, and subsequently became owner of the entire tract, claimed that the grant included the Una de Gato body of land above refered to, but did not extend north beyond the summit of the Raton mountains. Also that in 1867 he caused a private survey to be made, and at his instance the surveyors ran the northern line south of the Raton mountains, and erected mounds accordingly. Nothing is preserved of this survey, and it rests mainly on the testimony of one witness. As against this, it may be noticed that in all his claims upon the government, in all the writings produced, Maxwell, while not pretending to state the exact northern boundary, expressed his opinion that upon survey it would be found to extend a few miles into Colorado. This is certainly as satisfactory as any loose and general statements to employes and strangers. Further, Maxwell was not in the country at the time of the grant and juridical possession, and all his information as to extent and boundaries must, of course, have come from others' statements. His residence, after he became interested in the grant, was in the valley of the Rayado, in the southern portion. The northern part being mountainous, was deemed of little value; so that while these facts make against the survey and patent, it cannot be held that they are sufficient to overthrow them; they do not prove the true line. At the best they simply indicate what he then thought was that line. These are the principal lines of investigation and inquiry, and the salient features of the case. As I said before, it needs the maps and plats which are spread before me, and which I cannot incorporate in this opinion, to make clear all the matters and considerations noticed. Summing all the testimony, I conclude this branch of the case by saying that while the absolute correctness of this survey may not have been demonstrated, indeed, in the very nature of the case, the accuracy of every line can never be made certain,—the government has wholly failed to show that it is not correct, and the strong probabilities are that it corresponds as nearly to the limits of the original grant as can ever be ascertained.

So far as the allegations of fraud and the intentional wrong on the part of the surveyors or the claimants, there is not a syllable of testimony worthy of the slightest consideration. The surveyors had no interest in the matter. They followed the instructions of the land department. They acted on the only testimony presented to them, or within their knowledge. They had no dealings with the parties interested in the grant, save as the latter protested against their action in excluding the Una de Gato tract from the survey. If ever there was an official act in which no improper conduct was shown on the part of the officials it is this survey. The same may be said of the conduct of the claimants. It is true, counsel claims that Maxwell caused a false and inaccurate copy of the *desino* to be forwarded from

New Mexico to the department at Washington. The only evidence on this point is a letter of the surveyor general of New Mexico, inclosing what he says is an authenticated copy, and which he forwards at the request of Maxwell. The copy appears to be authenticated. It is not shown who prepared it, or that it was ever seen by Maxwell. The inaccuracies are simply these: The length and width of the grant, as shown in the original and the copy, do not correspond. In the copy the width is reduced about 15 per cent., so that it gives the appearance of a longer and narrower tract than the original. Of course this change alters the angles at the corners a trifle. Further, in the original on the west line are three unnamed hieroglyphic scrawls, which are not copied. What these signify, if anything, no man can tell. Counsel for government think that they are intended to mark the location of three mountain peaks, while counsel for defendants claim that they indicate the sources of three rivers flowing westward. If I were at liberty to indulge in the Yankee habit of guessing, I should guess that counsel for defendants are right. But leaving guesses out, they are absolutely meaningless. Now, it seems trifling to assume that this inaccuracy was intentional, and that it was at the instance of Maxwell, and was with the intent on his part, assisted by the officials in the surveyor general's office, to defraud the government. Certainly a conclusion based upon such assumptions would outrage the first principles of evidence.

Again, the making of the Griffin survey, and the filing of the plat thereof, in the office of the land department, are charged as wrong. The facts in regard to this are as follows: In 1869, many years after the passage of the confirmatory act of congress, Maxwell, the then owner, applied to the surveyor general of New Mexico for an official survey. The law requiring the claimants to pay the expenses of such survey, the surveyor general called upon him to deposit $5,500, the estimated cost, which was done. Thereupon a contract for the survey was made with W. W. Griffin, a deputy surveyor, and sent to Washington for approval. The secretary of the interior held that the confirmation vested title to only 22 leagues, within the out-boundaries, and the contract was disapproved. Maxwell was endeavoring to sell the property; had given an option bond to Chaffee and others. After the disapproval of the contract the parties interested made a personal contract with the same deputy surveyor for a private survey. This survey was accordingly made, and a plat thereof forwarded to the department at Washington. This survey included the Una de Gato and the Animas valley tract, as heretofore mentioned. Otherwise, it was substantially in accord with the latter official survey. Now, if there was any wrong in this, if it carries evidence of fraud, I am unable to see it. Even if the secretary had been right in holding that the confirmation only vested title to 22 leagues instead of the entire tract, there was certainly room for difference of opinion, and a party cannot be adjudged a wrong-doer who simply asserts the full extent of

the title he believes he has, and resorts to the only means left to him of ascertaining its true limits. I think the course pursued was natural, appropriate, and just. Filing this plat with the department was an open assertion of their claim. Instead of indicating fraud and an intention to deceive, it shows an honest belief in the justness of the claim, and the extent of the grant. The option bonds in which the tract is described, and its area estimated at about 2,000,000 acres, are equally free from any just criticism. True, the estimated area is shown to have been excessive; but all the information possessed was given, and the mistake is not so gross as to indicate an intent to deceive. If it had been twice as large, and known to be excessive, I do not see how the government could have been defrauded. The purchasers would be the only parties who could justly assert any wrong. Now these being the facts upon which fraud and imposition are predicated, is it not just to say that the government has wholly failed to prove its allegations?

More need not be added. I leave the case with the final observation that, after the fullest inquiry and observation by the government, with all the means and facilities at its command, the officials of the government and the claimants of the grant stand without a stain upon the rectitude of their conduct; and the boundaries of the grant, as finally surveyed and patented, if not proved to be absolutely accurate and correct, are at least shown to be as nearly so as any known testimony can determine.

The bill will be dismissed.